351 So.2d 1062 (1977)
CROSS KEY WATERWAYS et al., Petitioners,
v.
Reubin O'd. ASKEW et al., Respondents.
The CITY OF KEY WEST et al., Petitioners,
v.
Reubin O'D. ASKEW et al., Respondents.
The CITY OF KEY WEST et al., Petitioners,
v.
Reubin O'D. ASKEW et al., Respondents.
Nos. Y-362, Y-363 and Y-430.
District Court of Appeal of Florida, First District.
August 10, 1977.
*1063 Murray H. Dubbin, Dubbin, Schiff, Berkman & Dubbin, Charles H. Netter, Miami, Richard W. Ervin, Joseph C. Jacobs and Robert J. Angerer, Ervin, Varn, Jacobs, Odom & Kitchen, Tallahassee, and Tittle & Tittle, Tavernier, for petitioners.
Robert L. Shevin, Atty. Gen., James D. Whisenand, and Richard M. Goldstein, Asst. Attys. Gen., Tallahassee, for respondents.
SMITH, Judge.
These petitions for review challenge Rule 22F-8 of the Governor and Cabinet, acting as the Administration Commission, Department of Administration,[1] and underlying provisions of the Florida Environmental and Water Management Act of 1972, Chapter 72-317, Laws of Florida, as amended, Sections 380.05(1)(a), and (2)(a) and (b), Florida Statutes (1975). Rule 22F-8 designates virtually all the Florida Keys[2] as an area of "critical state concern" and prescribes principles for guiding development of the area's "earth, water, and air." Section 380.031(6). The designation subjects development there to regulation in the regional and state interests by the Administration Commission. We previously endorsed the standing of these citizens, municipalities and others affected by the rule or whose participation as parties in the proceeding was recognized by the Administration Commission. Sections 120.52(10), .54, Florida Statutes (Supp. 1976); City of Key West v. Askew, 324 So.2d 655 (Fla.1st DCA 1976).
Section 380.05 delegates power to the Administration Commission to establish government of land development by the Administration Commission superseding constituted local government  here, that of Monroe County and the municipalities of Key West, Key Colony Beach, and Layton. The fundamental constitutional issue, which we reach after resolving all other issues adversely to petitioners, is whether that delegation of legislative power was attended by adequate standards for its exercise. We hold the Section 380.05(2)(a) and (b) standards for exercise of the Section 380.05(1) power are inadequate, that the delegation consequently offends Article II, Section 3, Florida Constitution, and that Rule 22F-8 must be quashed.
To "conserve and protect" Florida's natural resources and scenic beauty, the Constitution *1064 requires "adequate provision" by law "for the abatement of air and water pollution and of excessive and unnecessary noise." Article II, Section 7, Florida Constitution. The Act here drawn in question was the 1972 Legislature's response to that constitutional requirement and the Governor's urgent recommendation.[3] Chapter 380 provides for Administration Commission supervision and, where deemed necessary, supersession of local government regulation of development, by designation and regulation of areas of critical state concern, Section 380.05, and by similar control of developments of regional impact, Section 380.06.
Geographic areas of critical state concern designated by the Commission are subject to "principles for guiding the development of the area" promulgated by Commission rule. Section 380.05(1)(b). Those principles are carried into effect either by approval of local government's "existing land development regulations for the area," Section 380.05(5), (6), or by superseding regulations of the Commission, adopted on recommendation of the Division of State Planning[4] when local regulations "do not comply with the principles for guiding development." Section 380.05(8). Once established, regulations for land development may be changed by local government only by consent of the Division of State Planning or the Administration Commission. Sections 380.05(10), (11). Local governments retain authority to administer the regulations but "proper enforcement" may be judicially enforced at the instance of the Division of State Planning. Section 380.05(9). Local orders authorizing or denying development under the regulations may be appealed by affected persons, including state and regional planning agencies, to the Governor and Cabinet acting as the Florida Land and Water Adjudicatory Commission. Section 380.07. All such agency action is finally reviewable by a district court of appeal, in the manner we now review Rule 22F-8 itself, under the Administrative Procedure Act, Chapter 120.
The Act affects regulation of virtually all development in areas of critical state concern: all building, mining, and changes in the use or appearance of land, water and air and appurtenant structures; material increases in the density of its use; alteration of shores and banks; drilling; structural demolition; clearing adjunct to construction; and deposit of waste or fill. Excepted are work by road agencies and other utilities; structural maintenance affecting only the interior or the color or exterior decoration of a structure; the use of structures for customary dwelling purposes; changes of usage within the same regulated class of use; changes in ownership; and changes in rights of access, riparian rights, easements and covenants affecting rights in land. Section 380.04. Such regulation has by law heretofore been committed to county and municipal governments, subject to general law regulating the use and development of particular resources. Sections 163.160 et seq.; 163.205, .210, .215; 163.360; 163.567; 163.611; 163.622; 161.25; 161.35; 125.01(g)-(j); 177.071; 166.021, Florida Statutes (1975).
Section 380.05 does not purport to disturb conventional tests of whether governmental land use regulations unlawfully impinge private property rights. The Act imposes on the Administration Commission and subordinate agencies commonly understood restraints on state control at any level. The Administration Commission's land development regulations "may include any type of regulation that could have been adopted by the local government," and by implication they extend no further. Section 380.05(8). The Commission "is not authorized to adopt any rule that would provide for a moratorium on development in any area of critical state concern." Section 380.05(1)(b). Certain vested rights to develop *1065 are protected. Section 380.05(15). The Act preserves "all the existing rights of private property ... in accord with the constitutions of this state and of the United States," Section 380.021, and prohibits a rule or order which is "unduly restrictive or constitutes a taking of property without the payment of full compensation." Section 380.08(1). Thus invoking well-established standards which limit governmental regulation of the use of private property, the Act does not unconstitutionally take private property without compensation, deprive persons of property without due process of law, or abridge the basic right to acquire, possess and protect property. Article I, Sections 2, 9, Article X, Section 6(a), Florida Constitution. See D'Alemberte v. Anderson, 349 So.2d 164 (Fla. 1977).
While the Act thus assures government shall exercise no unconstitutional powers in the regulation of private property, it shifts ultimate regulatory authority from the county courthouse and city hall to the Capitol. The Act thus touches sensibilities as old as the Revolution itself, because it affects the right of access to government  the right of the people effectively "to instruct their representatives, and to petition for redress of grievances"[5]  on which other cherished rights ultimately depend. The primacy of local government jurisdiction in land development regulation has traditionally been, in this country, a corollary of the people's right of access to government. In a sense, therefore, the jurisdictional claim of local governments in these matters is based on historical preferences stronger than law. Yet it is clear that counties and municipalities, supported by those who have enjoyed fruitful access to those governments, have no constitutionally vested jurisdiction in the regulation of the "earth, water, and air" within their confines. The power exercised or withheld by those governments is the state's power, appropriately delegated.[6] By law all but a few charter counties may be changed or entirely abolished. Article VIII, Section 1(a), Florida Constitution. The jurisdiction of every county, charter or non-charter, is subject to qualification by law.[7] Municipalities "may be established or abolished and their charters amended pursuant to general or special law," and they may exercise municipal powers "except as otherwise provided by law." Article VIII, Section 2.
The Florida Constitution does not forbid State reclamation of regulatory power from local government and its reassignment to State agencies. The same Constitution which permitted the state's delegation of power to local governments in the first instance also provides the means for reclamation to vindicate paramount state or regional interests. The means, of course, is legislation. Statutes which indirectly subordinate local government autonomy, through regulatory agencies having independent and concurrent jurisdiction in matters of state or regional interests, are commonplace.[8] Though of more recent lineage, *1066 statutes providing for direct agency supervision and supersession of local government regulation are no less legitimate under the Constitution. In 1973, one year after enacting Section 380.05, the Florida Legislature asserted overriding state and regional interests in a specific area designated the Big Cypress area of critical state concern, and reallocated to the Administration Commission the ultimate regulatory power previously exercised by local governments in that area. Chapter 73-131, Laws of Florida; Section 380.055, Florida Statutes (1975).
The judicial doctrine that legislative delegation of regulatory power must be attended by meaningful standards for its exercise is derived from Article II, Section 3 of the Constitution, which provides:
"No person belonging to one branch shall exercise any powers appertaining to either of the other branches unless expressly provided herein."
Except for the Big Cypress, Chapter 380 does not specify geographic areas where, because of critical state concerns, the regulatory jurisdiction of local governments is to be supervised or superseded by the Administration Commission. By Section 380.05, the power to select the sites of desirable regulation, as well as the power to regulate, is delegated to the Commission. The Act is not entirely without standards for exercise of the Commission's jurisdiction. A certain continuity is assured in "the reasons why the particular area proposed is of critical concern," the advantages of designation, the principles for guiding development in the area and the resulting development regulations.[9] Yet the source of all of those considerations is the Commission itself or the Bureau of Land Planning, the Commission's subordinate agency. The principal statutory guidance for the Commission's designation power is found in Section 380.05(2), which provides:
"An area of critical state concern may be designated only for:
"(a) An area containing, or having a significant impact upon, environmental, historical, natural, or archaeological resources of regional or statewide importance.
"(b) An area significantly affected by, or having a significant effect upon, an existing or proposed major public facility or other area of major public investment.
"(c) A proposed area of major development potential, which may include a proposed site of a new community, designated in a state land development plan."
The Administration Commission's designation power is also subject to a statutory limit of 500,000 acres in the first year after the 1972 enactment and an overall limit of five percent, roughly 1.8 million acres, of Florida land. Section 380.05(17). An inventory of state-owned lands was required before designation of any area of critical state concern. Section 380.05(1)(a). Section 380.10 requires continuing legislative approval of the Administration Commission's "standards and guidelines" for identifying developments of regional impact, and the legislature approved the initial standards in 1973. HCR 1039, Laws of Florida (1973). There is no comparable provision for legislative supervision of the Administration Commission's designation of areas of critical state concern. The Act also provided that no area of critical state concern should be designated "until a favorable vote at a referendum on a state bond program for the acquisition of lands of environmental importance to the state or region." *1067 Chapter 72-317, Section 13, Laws of Florida. That condition was fulfilled. Chapter 72-300, Laws of Florida authorized, subject to referendum in November 1972, $240,000,000 of general obligation bonds to fund capital projects for "environmentally endangered lands" and "outdoor recreation lands." The electorate approved.[10]
Adequate guidance for the Commission's power to supersede local government must be found, if at all, in the five percent limitation and the Section 380.05(2) criteria for designation. Neither the Act's provision for an inventory of state-owned lands nor its requirement of a public referendum on peripheral issues guides Administration Commission discretion in the designation of areas of critical state concern. The Administration Commission has evidently been sensitive and sparing in the imposition of its regulatory power under the Act,[11] but administrative self-restraint cannot supply legislative standards which are otherwise absent.
We are concerned here with the adequacy of two of the three alternative statutory criteria for designation of areas of critical state concern: areas found to contain or have a "significant impact" on environmental, historical, natural or archaeological resources of regional or statewide importance and areas found to be "significantly affected by" or as "having a significant effect upon" major public facilities and areas of major public investment. Section 380.05(2)(a), (b).[12] We need not deal with the subsection (c) criteria for designation of "a proposed area of major development potential ... designated in a state land development plan." That classification, not invoked in designating the Florida Keys area of critical state concern, refers to a comprehensive plan which must meet independent statutory standards and be approved by the legislature. Section 23.011 et seq., Florida Statutes (1975).
The subsection (a) and (b) standards must be judged by the principles repeatedly stated by our Supreme Court in construing Article II, Section 3 of the Constitution:
"The legislature may not delegate the power to enact a law, or to declare what the law shall be, or to exercise an unrestricted discretion applying a law; but it may enact a law complete in itself designed to accomplish a general public purpose, and may expressly authorize designated officials within definite valid limitations to provide rules and regulations *1068 for the complete operation and enforcement of the law within its expressed general purpose." State v. Atlantic Coast Line Ry. Co., 56 Fla. 617, 636-37, 47 So. 969, 976 (1908).
"When the statute is couched in vague and uncertain terms or is so broad in scope that no one can say with certainty, from the terms of the law itself, what would be deemed an infringement of the law, it must be held unconstitutional as attempting to grant to the administrative body the power to say what the law shall be." Conner v. Joe Hatton, Inc., 216 So.2d 209, 211 (Fla. 1968) (emphasis in original).
In Sarasota County v. Barg, 302 So.2d 737 (Fla. 1974) the Supreme Court invalidated, as violative of Article II, Section 3, an act creating the Manasota Key Conservation District within Sarasota County, designating it as a wildlife and marine life sanctuary, and proscribing "undue or unreasonable" dredging, filling and disturbance of submerged bottoms and "unreasonable destruction" of natural vegetation resulting in "harmful" or "significant" air and water pollution. Concerning the operative phrases, the Court held:
"The Act does not contain any standards or guidelines to aid any court or administrative body in interpreting these terms. The determination of what conduct falls within the proscription of these ambiguous provisions is left to the unbridled discretion of those responsible for applying and enforcing the Act. This amounts to an unrestricted delegation of legislative authority, in violation of the Florida Constitution, Article II, Section 3, F.S.A." 302 So.2d at 742.
See also Lewis v. Bank of Pasco County, 346 So.2d 53 (Fla. 1977).
The statutory limitations on exercise of the Commission's designation power are unconstitutionally vague by the standards expressed by our Supreme Court in Atlantic Coast Line, Conner and Barg.[13] Subsections (a) and (b) of Section 380.05(2) inadequately control the Commission's determination of what the law shall be concerning the choice of areas to be designated of critical state concern. More precisely, the statute delegates to the Commission the power to say who in Florida the lawgiver shall be, whether local government or the Commission itself, and it does so virtually without statutory discipline. What is at stake here is not the extent of government regulation of private property but the structure of Florida's government. Power to reorder that structure in selected areas is left to the discretion, as determined by majority vote, of the Governor, Secretary of State, Attorney General, Comptroller, Treasurer, Commissioner of Agriculture, and Commissioner of Education.[14] Constitutionally, that will not do.
*1069 The terms critical state concern, significant impact, and significant effect, as used in the Act, are quantitative approximations of the point where the detriment to or influence of a valued resource evokes a state or regional concern for its preservation and development. Although those terms are much like the terms undue or unreasonable dredging or filling and harmful or significant pollution, condemned as qualifying standards in Barg, we do not consider the use of those terms, standing alone, as fatal to the designation criteria. Such approximations of the threshold of legislative concern are meaningful in common parlance; they are a practical necessity in legislation regulating complex subjects; and, above all, they are now susceptible to refinement by policy statements adopted as rules under the 1974 Administrative Procedure Act, Chapter 120, and as so refined are judicially ascertainable and enforceable. See Straughn v. O'Riordan, 338 So.2d 832 (Fla. 1976); McDonald v. Dep't of Banking and Finance, 346 So.2d 569 (Fla.1st DCA 1977). The 1974 APA was not effective when Barg[15] was decided.
The greater deficiency of Section 380.05(2), subsection (a), is that it does not establish or provide for establishing priorities or other means for identifying and choosing among the resources the Act is intended to preserve. That subsection lacks the specificity of the Big Cypress designation, the predictability of a legislatively approved comprehensive plan which confines subsection (c) criteria,[16] the rule standards required for Section 380.10 identification of developments of regional impact, and any other standards for the necessary choice. The Act treats alike, as fungible goods, disparate categories of environmental, historical, natural and archaeological resources of regional or statewide importance and all of Florida's manifold resources within those vast categories. Up to the acreage limit, the Commission is empowered to supersede as it chooses the local governments regulating development in historic Pensacola or St. Augustine, or at the shores of the Atlantic and Gulf of Mexico to a depth of a thousand feet, or in all acreage on the Suwannee and St. Johns and their tributaries or, indeed, in all the Florida Keys. If Cedar Key, Ybor City, Palm Beach and the path of the King's Road are found to be historic resources of satisfactory importance, they too may be designated. Subsection (a) reaches beyond those areas to include, as similarly eligible for designation, areas which for unstated reasons "impact" valued resources elsewhere. Subsection (b) expands the choice to include areas which in unstated ways affect or are affected by any "major public facility," which is defined in Section 380.031(10), or any "major public investment," which is not.
The Act also lacks suitable standards for identification of local governments whose stewardship of valued resources is to be deemed inadequate to protect state and regional *1070 interests. Section 380.05's endpoint of supervision and supersession of local regulation implies a major premise that some local governments are unresponsive to regional and statewide interests in the regulation of local land developments.[17] That implication is underscored by the foremost principle for guiding development adopted by the Commission for the Keys. Supra, n. 12. The legislature is perfectly competent to decide that all local governments, or some particularly, have inadequately protected state and regional interests. Or the legislature may eschew such judgments and predicate designation entirely on the intrinsic value, as measured on some ascertainable scale, of resources of critical state concern. But if the unresponsiveness of local governments to larger interests is to be a substantial factor in the designation of critical areas, standards for that assessment must attend delegation of the power to choose. Changing the seats of political power is a function of Florida's Constitution and laws, for which "the political sensitivity of the final administrative decision-makers"[18] is an unacceptable substitute. The people have little need for protection against political sensitivity at its best. Their constitutional safeguards against coalescence of the powers to make and to execute laws protect against political sensitivity at its worst, by which the interests of the least powerful are the first, but not the last, to be subordinated. We are mindful that the required particularity of statutory limitations on administrative discretion may be greater or less, depending on the subject and the difficulty of the task. E.g., State, Dep't of Citrus v. Griffin, 239 So.2d 577 (Fla. 1970). We have scoured the text and legislative history of Chapter 380 for evidence that the legislature considered formulation of standards for the political judgments required by Section 380.05 to be beyond its competence. Our search was in vain.
Absent standards undergirding the administrative decisions authorized by Section 380.05(2)(a) and (b), the judiciary is impotent to check the unwarranted exercise of the delegated power. The converse is also true. Without ascertainable standards, the judiciary cannot enforce the legislature's purpose by requiring action of an apathetic Commission which, though it has the power, duty and opportunity to designate areas of critical state concern, will not do so. Section 120.68(13)(a)1, Florida Statutes (Supp. 1976).[19]State ex rel. Siegendorf v. Stone, 266 So.2d 345 (Fla. 1972); Met. Dade County v. Mingo, 339 So.2d 302 (Fla.3d DCA 1976); Sauls v. De Loach, 182 So.2d 304 (Fla. 1st DCA 1966), cert. den., 188 So.2d 823 (Fla. 1966).
In reaching the constitutional question, we have considered petitioners' other points and have found them unavailing. The designating rule was not rendered invalid by its filing with the Department of State eight days after expiration of the 45-day statutory period for Commission *1071 adoption of a designating rule recommended by the planning agency. Section 380.05(1)(b). The tardiness of the filing was not, in these circumstances, "a material error in procedure." Section 120.68(8). Contrast Postal Colony Co., Inc. v. Askew, supra n. 16, in which we were concerned with the explicit statutory consequences of tardy adoption of land development regulations for a designated area of critical state concern. The rulemaking procedures of Section 120.54 adequately protected any "substantial interests" of the persons affected, and the Commission did not err in failing to provide them a formal proceeding under Sections 120.54(16) and 120.57. The Commission did not otherwise procedurally err.
Our decision therefore invalidates, as violative of Article II, Section 3, Florida Constitution, the Act's delegation of power to designate areas of critical state concern by criteria expressed in Section 380.05(2)(a) and (b). Our decision does not affect other aspects of the Act. The prayer of the petition for review is GRANTED. Rule 22F-8, designating the Florida Keys area of critical state concern and promulgating principles for guiding development in that area, is QUASHED.
MILLS, Acting C.J., and MELVIN, WOODROW M., Associate Judge, concur.
NOTES
[1] Art. IV, § 4, Fla. Const.; §§ 20.03(1), 20.31(2), Fla. Stat. (1975).
[2] "All lands in Monroe County, except: (1) that portion ... included within ... the Everglades National Park and areas north of said Park; [and] (2) all lands seaward of mean high water that are owned by local, state, or federal governments."
[3] Sec. 380.021, Fla. Stat. (1975); Jour.H.R. Feb. 1, 1972, pp. 5-6 (Reg.Sess. 1972).
[4] The Division of State Planning, Department of Administration, is the "state land planning agency" having responsibilities under Chapter 380. Postal Colony Co., Inc. v. Askew, 348 So.2d 338 n. 1 (Fla.1st DCA 1977), rehearing denied this date.
[5] Art. I, § 5, Fla. Const.
[6] Nash v. Vaughn, 133 Fla. 499, 182 So. 827 (1938). See also State ex rel. Taylor v. City of Jacksonville, 101 Fla. 1241, 133 So. 114 (1931); State ex rel. Skillman v. City of Miami, 101 Fla. 585, 134 So. 541 (1931).
[7] "Counties operating under a charter are presumptively considered to have the broad powers of self-government (with the exception of precedence over municipal ordinances which must be provided in the charter) unless provided otherwise by general law or by the special law adopting the charter. Thus, charter counties and non-charter counties apparently start from different poles in their relationships with legislative enactments. Both could, conceivably, be the same depending on the legislation adopted." D'Alemberte, commentary on Art. VIII, § 1, Fla. Const., 26A Fla. Stat. Ann. 271 (1970).
[8] Overlapping regulations at both local and state levels tend to produce baffling complexity. See F. Bosselman and D. Callies, The Quiet Revolution in Land Use Control 27 (1971): "A common failing of most of the new state land regulatory systems is that they do not relate in a logical manner to the continuing need for local participation. Most of them tend to bypass the existing system of local regulation and set up completely independent and unrelated systems. This requires the developer who is subject to both systems to go through two separate and distinct administrative processes, often doubling the time required and substantially increasing the costs required to obtain approval of the development proposal."
[9] Under § 380.05(1), recommendations for the designation of specific areas of critical state concern emanate from the Division of State Planning, Bureau of Land Planning, citing "the reasons why the particular area proposed is of critical concern to the state or region, the dangers that would result from uncontrolled or inadequate development of the area, and the advantages that would be achieved" by designation. The Bureau also recommends "specific principles for guiding the development of the area." The Administration Commission is then authorized to adopt or reject the recommendation "and by rule designate the area of critical state concern and the principles for guiding the development of the area." Land development regulations are then approved by the Division or promulgated by rule of the Commission.
[10] "[C]onditioning the exercise of ELA § 380.05(2)(a) upon the state's having financial resources to purchase lands, if necessary, was a crucial compromise that prevented the Bill, (except for the section nine study committee) from being defeated. The bond referendum passed on November 7, 1972, by a vote of 1,131,718 for and 482,584 against. Tallahassee Democrat, Nov. 8, 1972, at 12, col. 1." Finnell, Saving Paradise: The Florida Environmental Land and Water Management Act of 1972, 1973 Urb.L. Ann. 103, 121 n. 91.
[11] The Administration Commission conducted public hearings in Monroe County on the question of the proposed designation. Full opportunity was given for the expression of opposing points of view. Ordinances of the Monroe County board of county commissioners and the city commissions of Key West, Key Colony Beach, and Layton were approved as Administration Commission regulations, apparently without drastic change. Superseding regulations were adopted for administration by the City of North Key Largo Beach. Fla. Admin. Code Rules 22F-9, 22F-10, 22F-11, 22F-12, 22F-13.
[12] The Commission's "principles for guiding development" reflect in summary form the regional and state interests in the Florida Keys which are stated at greater length in the Bureau's recommendations. The objectives for the area are strengthening local government capabilities for land development regulation to the end that local governments may achieve other objectives without continuation of the designation; protection of tidal mangroves and associated wildlife and other resources; minimizing the adverse impact of development on water quality in the Keys; protection of scenic resources and promotion of the management of unique vegetation; protection of the Keys' historical heritage; protection of major public investments, including facilities for water supply, sewage and solid waste disposition, the Key West Naval Air Station and the Overseas Highway; minimizing the adverse impact of proposed public investment on the Keys' natural and environmental resources; protection of the public health, safety, welfare and economy; and the maintenance of the Keys "as a unique Florida resource." Fla. Admin. Code R. 22F-8.03A.
[13] We have not overlooked the Supreme Court's recent decision in State v. Dye, 346 So.2d 538 (Fla. 1977), in which a divided Supreme Court upheld, against a charge of overbreadth offending the due process clause, § 810.09, Fla. Stat. (1975). That statute punishes for trespass one remaining on property despite notice to leave. The Court held the statute was not deficient for failure to specify "who may make such a demand" to depart school property. A school custodian was held authorized to issue such a demand because

"he is statutorily mandated to manage school property `to the best interests of education,' Section 230.23(2), Florida Statutes (1975). It seems clear that a school custodian must on occasion determine whether the presence of certain individuals on school property is `in the best interests of education.' The Legislature cannot statutorily adopt elucidatory standards to substitute for individual judgment. If that discretionary judgment is unsound, the alleged trespasser can defend on those grounds. If that discretionary judgment is applied arbitrarily or capriciously to the defendant, then he is protected by the due process and equal protection guaranties of the Florida and United States Constitutions."
The applicability in some cases of Florida's constitutional provision for separation of powers, Art. II, Section 3, Fla. Const., and the applicability in others of the United States Supreme Court's due process standards may account for an apparent disparity in the reasoning of those cases, as criticized by Mr. Justice Ervin's dissent in Sarasota County v. Barg, supra, 302 So.2d at 745.
[14] Rule 22F-8 passed by a vote of five to two after a substitute resolution to reconsider the designation after six months failed, four to three.
[15] Professor Davis offers this sardonic evaluation of Barg: "If the Florida test were used, approximately one hundred percent of federal legislation conferring rulemaking authority on federal agencies would be unconstitutional." K. Davis, Administrative Law of the Seventies, ch. 2 "Delegation of Power" at 33 (1976). One need not entirely join Professor Davis' lament to appreciate his point that agency rulemaking should increasingly be used to provide particular standards which would otherwise be required of the legislature.
[16] The model act from which §§ 380.05 and .06 were drawn does not require a comprehensive state plan for designation but recognizes that selection of all areas of critical state concern "would logically require a comprehensive study of the state's development patterns and natural resources." The ALI reporters state that requiring formulation and legislative approval of a comprehensive state plan before designating problem areas of "immediate and critical importance" would conceivably place their effective regulation beyond reach. ALI Model Land Development Code § 7-201, note at 259-60 (1975) (emphasis added). If the immediacy or emergency nature of a critical state concern is thought to require designation power independent of priorities in a state plan otherwise required, standards for the exercise of emergency powers may be legislated. Cf. § 120.54(9), Fla. Stat. (Supp. 1976); Postal Colony Co., Inc. v. Askew, 348 So.2d 338 (Fla. 1st DCA 1977). The emergency rulemaking powers authorized by the APA, effective for only 90 days, would not appear adequate for the purposes of § 380.05.
[17] ALI Model Land Development Code, supra n. 16, at 251, 257 et seq. See also Bosselman and Callies, supra n. 8, at 1: "The ancien regime being overthrown is the feudal system under which the entire pattern of land development has been controlled by thousands of individual local governments, each seeking to maximize its tax base and minimize its social problems, and caring less what happens to all the others."
[18] The full implication of the delegated political power to establish a system of regulatory government is suggested in Professor Finnell's article, supra n. 10, at 122: "In summary, then, the areas of most critical concern to the State will likely be designated Critical Areas. But contrariwise, the legislative safeguards combined with the political sensitivity of the final administrative decision-makers  the state's highest elected executive officers, the Governor and Cabinet, sitting as an Administration Commission  should assure that the increased state role in land development regulation by means of the Critical Area technique will occur only when there is a compelling state interest backed by a strong public consensus." (Emphasis added.)
[19] A reviewing court may "[o]rder agency action required by law" and "order agency exercise of discretion when required by law." The APA further provides that "[a]ny person regulated by an agency or having a substantial interest in an agency rule may petition an agency to adopt, amend, or repeal a rule... ." Section 120.54(5).