368 So.2d 653 (1979)
ALACHUA COUNTY, Appellant,
v.
James K. REDDICK and Annie Mae Reddick, His Wife, Appellees.
No. KK-191.
District Court of Appeal of Florida, First District.
March 20, 1979.
*654 George H. Nickerson, Jr. and Marilyn C. Wolf, Gainesville, for appellant.
Philip A. DeLaney, of Andrews & DeLaney, Gainesville, for appellees.
SMITH, Acting Chief Judge.
Alachua County appeals from a circuit court judgment enjoining the enforcement of a zoning classification of the Reddicks' property more restrictive than commercial. The property is now zoned for low-density residential purposes. The board of county commissioners denied the Reddicks' application for BH (Highway Oriented Services) zoning. After a trial, the circuit court ordered commercial zoning of an unspecified character, holding that the board's decision
... was not reasonably related to any valid public need, nor did it have a material bearing upon the public health, safety, morals or general welfare of the community, and was therefore not a valid exercise of the police power vested in the [county].
Alachua County contends on appeal that its zoning decision had a rational basis in the circumstances and the public welfare, that the basis for its action was at least fairly debatable, that the Reddicks' property interests were not confiscated, and that the circuit court erred in issuing a mandatory injunction for commercial rezoning. We agree, and reverse.
Archer Road intersects Interstate Highway 75 southwest of Gainesville in an area previously devoted to agricultural, residential, and scattered industrial use. The interchange connecting the two roadways is the largest in Alachua County, indeed the largest in north Florida. Alachua County's director of planning and development, the witness Lewis, described the interchange as "probably one of the most important ... in the state of Florida." By that interchange I-75 motorists from the north and south turn east on Archer Roach to reach Gainesville's large public medical complex and "sporting events and the conferences and so on going on at the university." At the interchange I-75 lies northwest and southeast and Archer Road lies northeast (six lanes through shopping area toward Gainesville) and southwest (four lanes now, two additional lanes proposed). Neighborhood circumstances are as shown in the appended sketch.
The zoning here questioned restricts automobile-oriented commercial development near the interchange to 109 acres of land lying in four roughly equivalent quadrants immediately surrounding the structure. Service roads to those quadrant properties minimize interference by their traffic with free passage on the interchange and on Archer Road. The Reddicks' narrowly rectangular property, 5.7 heavily wooded acres fronting 210 feet on the south side of Archer Road, lies just beyond and southwest of the southwest quadrant and its service road, 1,000 feet from I-75. The Reddick tract is separated from the southwest quadrant by a cleared 100 foot wide electrical transmission easement adjoining the Reddicks' eastern boundary. At Archer Road the transmission lines turn west on an old 60 foot wide railroad right-of-way between Archer Road and adjoining private properties.
*655 The Reddicks' tract is zoned R-1A (Single Family-Low Intensity), and they maintain their home there. The house is two to three hundred feet back from the frontage. Neighboring properties farther southwest on Archer Road are similarly zoned and used as residences. The Reddicks, desiring now to place a motel on their property, requested rezoning to commercial BH (Highway Oriented Services), an intensive commercial classification which permits motels, filling stations, and restaurants including fast food drive-ins. The county commission accepted professional advice to prevent strip commercial development along Archer Road southwest of the interchange, and denied the BH rezoning requested by the Reddicks.
The board of county commissioners denied the Reddicks' application for BH zoning after repeated hearings and long study of this and other rezoning requests affecting property near the Archer Road interchange. Three years before the scope and design of the Archer Road interchange were fully developed, the commission had adopted a highly generalized color-coded land use planning map (exhibited in this record at 1' = 3,000 feet) which shows commercial usage surrounding the Archer interchange and including the northeast tip of the Reddicks' tract. In 1975 and early 1976, the board of commissioners, the county director of planning and development, the county planning commission, and the North Central Florida Regional Planning Council, engaged as a consultant, proposed and debated several more carefully drawn approaches to the problem. The commission's final decision in February 1976 endorsed the advice of planning and development director Lewis against strip commercial development southwest of the interchange on Archer Road; and, to that end, the commission denied the Reddicks' and four other petitions for intensive commercial development. As the witness Lewis testified, the county commissioners had come to regard the strip commercial development on the Newberry Road approach to I-75, approximately three miles to the north, as a "disaster." The Newberry Road lesson was that the proliferation of automobile-oriented businesses on an interchange approach produces numerous driveways serving narrowly spaced establishments, a considerable volume of locally-bound traffic turning off and on the approach, left and right, and a resulting "glut" of traffic tending to make the highway "unusable."
The testimony of Lewis and the written submissions to the board of county commissioners, during their deliberations, reveal also that the commission was concerned about striking a proper balance county-wide in the amount and locale of commercial and noncommercial properties. Of the 3,300 commercially-zoned acres in the Gainesville urban area, including the city, only 800 were in actual commercial use when the commissioners made their decision in this case. The underdevelopment of land already available for commercial use was another factor in the commission's decision not to expand, in this particular place, the county's inventory of such land.
Accepting the premise that strip commercial development should be restricted southwest of I-75 on Archer Road, the commission turned to the task of drawing a line somewhere between the commercial usage to be permitted in the southwest quadrant of the interchange, on service roads, and the existing residential properties on the southwestern stretch of Archer Road. On that subject Mr. Lewis' formal report advised the commission that the 100 foot wide electrical transmission easement which separates the Reddick property from the southwest quadrant and its service road was the best if not the only logical place to draw that line:
To the west of I-75 on the south side of Archer Road there exists a 100-foot easement immediately west of the Brown's Mobile Home Park, which provides a natural buffer between residential and nonresidential uses. This buffer also fronts at the point where the southwest quadrant access road intersects with Archer Road. Any intrusion of commercial uses of any kind beyond this buffer line, on either side of Archer Road, to the west in *656 the residentially zoned and partially developed area would open the door for strip commercial zoning along this entire stretch. There would be no reasonable cause for stopping it. Yet, so far as local market business is concerned, there is a five-acre neighborhood shopping center planned and zoned on the north side of Archer Road approximately 1 3/4 miles west of the center line of I-75. There will therefore be no need for local market businesses between that location and I-75, anyway.
In testimony before the circuit court the witness Lewis repeated the analysis he gave the county commission on the day of its decision:
[A]bout any conclusion you could make on any of the properties on the [west] side of I-75 along Archer Road can be said  if you make justification for [rezoning] one property, you can make the same justification for all others. The result could be strip commercial development all the way down at least to Tower Road and perhaps even beyond.
.....
Q. In your opinion does this [100-foot wide easement] provide a boundary between commercial and residential use?
A. It provides a logical place to draw the line because there is no other logical place to the west.
Q. And why do you say that?
A. Well, because all the properties to the west are similar in nature. There are no open spaces as such that would service as a logical cutoff point. Once you get beyond to the west of that, there is no basis for saying there is where we are going to draw the line, because there's nothing physical present to make that distinction.
There is no substantial evidence in the record that the Reddicks have been deprived of the beneficial use of their property by the county's refusal to zone it for commercial development. Of course the tract is not the secluded country place it was when the Reddicks purchased it 30 years ago. The traffic on Archer Road is "more noisy" than before, though the house has some protection in its setback 200 feet from Archer Road. Other Archer Road residences, similarly situated, continue in use despite incursion of automobiles. The power poles and lines to the east, and extending westward along Archer Road on old railroad right-of-way, detract from the otherwise rustic appearance of the heavily wooded land. Traffic on I-75 was described by Mr. Reddick as "quite noisy," although the noise is muffled somewhat by the heavy woods surrounding the Reddicks' house. Significantly, a mobile home park continues to operate on the tract immediately northeast, across the 100-foot transmission line easement and within the southwest quadrant of the interchange. Mr. Reddick testified that "nobody would buy [his] property for residential anymore," but he has offered to sell it only as commercial property. The real estate salesperson who listed the property, and who wrote a contract to sell subject to BH rezoning, expressed the opinion that traffic anticipated within 20 years would make the property unsalable for a residence.[1] A professional real estate appraiser, the Reddicks' witness, conceded that the Reddick tract has "a value for single-family residence" purposes, although development costs on the narrow tract would make subdivision for several single-family residences problematic. He expressed the view that the "highest and best use" of the property in existing circumstances would be "a motel-restaurant type thing." Thus, while there is significant evidence that the Reddicks would be able to sell their land for more if a motel and restaurant could be built upon it, that the *657 residential character of the tract is less appealing than it was 30 years ago, and that Archer Road property will become less attractive as traffic increases over the next 20 years, there is no evidence that the Reddicks' and their neighbors' heavily wooded residential tracts south of Archer Road are now so affected by highway construction that they have lost all utility as residences and have been confiscated.
The Reddick tract therefore retains value and utility as a single-family residence under its existing R-1A zoning classification. Beyond that, the Reddicks introduced no substantial competent evidence justifying the desired leap over several intervening and more permissive zoning classifications to the traffic-intense BH classification, or to the slightly less intense BR commercial classification. Those intervening classifications include R-1B, allowing more single-family dwellings; R-1C, including mobile homes; MR, including mobile home parks, R-2, R-2A and R-3, allowing progressively more intense multi-family units; AP, permitting low-profile office uses; and RP, allowing professional offices. The Reddicks' testimony did not exclude the reasonable possibility of a number of those usages, one of which has precedent even nearer I-75 on Archer Road, and another  multi-family dwellings  has precedent near the Newberry Road interchange. None of these usages would burden Archer Road's traffic capacity to the extent of BH or BR commercial zoning; none would so clearly be the first domino to fall in the westward reach of strip commercial development along Archer Road.
The county's decision is justified both in its commitment to the nonproliferation of highway-oriented businesses on Archer Road and in its location of the boundary between residential and commercial usage. The decision was based on substantially demonstrated facts and sound policy related to the public safety and general welfare. It cannot reasonably be said that the elected county commission was arbitrary in concluding that erection of a motel and restaurant on the Reddicks' property would increase locally-bound traffic on Archer Road, depreciate the residences of the neighbors to the west, drive out those homes by creeping commercialism, and consume prematurely the capacity of Archer Road to carry the through traffic for which it was designed and built at considerable expense. Nor can the commission's decision fairly be termed confiscatory. The Reddicks' real estate appraisal witness conceded, "I don't say it will confiscate his property" to deny commercial rezoning. He said only that "I don't think that [residential use] would be the highest and best use of his property." A sales agent asked rhetorically "Who wants it [for residential use]?" and wished to sell the property for commercial usage, which is understandable, but she has not invited the market to answer her question. Moreover, her opinion was predicated on 1995 projections of traffic density on Archer Road northeast of I-75, which indisputably will carry more traffic than southwest Archer Road. Ante fn. 1. Her opinion of traffic impact there in 1995 cannot be determinative of whether the commission's decision confiscated, in 1976, land 1,000 feet southwest of I-75. Discounting her opinion is a matter of rejecting its predicate, not a matter of retrying the facts. Arkin Const. Co. v. Simpkins, 99 So.2d 557, 561 (Fla. 1957).
A zoning authority such as this board of county commissioners is not obliged in all events, and irrespective of the detrimental consequences to public facilities and neighboring properties, to rezone private property for its "highest and best use" or for its highest salability. S.A. Healy Co. v. Town of Highland Beach, 355 So.2d 813, 814 (Fla. 4th DCA 1978), and cases cited. Because substantial competent evidence supported the decision of the board of county commissioners, and the county commission's purposes in denying commercial rezoning at least debatably serve the public welfare, without confiscating the Reddicks' property, the circuit court erred in intervening to rezone the Reddicks' property. Skaggs-Albertson's v. ABC Liquors, Inc., 363 So.2d 1082, 1091 (Fla. 1978); Harrell's Candy Kitchen, Inc. v. Sarasota-Manatee *658 Airport Authority, 111 So.2d 439 (Fla. 1959); Thomas v. City of West Palm Beach, 299 So.2d 11 (Fla. 1974); Hillsborough County v. Twin Lakes Mobile Homes Village, 166 So.2d 191 (Fla. 2d DCA 1964), cert. disch., 170 So.2d 589; Dade County v. Yumbo, S.A., 348 So.2d 392 (Fla. 3d DCA 1977), cert. den., 354 So.2d 988; S.A. Healy Co. v. Town of Highland Beach, supra; Davis v. Sails, 318 So.2d 214 (Fla. 1st DCA 1975).
If the decision of the board of county commissioners were not otherwise sustainable, commercial zoning should not have been ordered without a showing by the Reddicks that all intervening zoning classifications were unconstitutionally restrictive. Board of County Commissioners v. Ralston, 284 So.2d 456 (Fla. 2d DCA 1973).
Somewhat inconsistently with their reliance on the real estate agent's opinion of the future detriment to the property by 38,000 vehicles using northeast Archer Road in 1995, the Reddicks urge that the county commission erred as a matter of law in apprehending premature traffic saturation of southwest Archer Road as a result of strip commercial development there. That position rests on isolated dicta in Davis v. Sails, supra, 318 So.2d at 218:[2]
The test as to the validity of a zoning ordinance is not whether it may on some future date bear the required relation to the public welfare, but rather whether it does so now. West Bloomfield, T.P. v. Chapman, 351 Mich. 606, 88 N.W.2d 377 [1958]; Gust v. Canton T.P., 342 Mich. 436, 70 N.W.2d 772 [1955]; Barney & Casey Co. v. Town of Milton, 324 Mass. 440, 87 N.E.2d 9 [1949].
The quoted language should not be read as forbidding zoning authorities to weigh the future impact of a zoning decision at hand. Planning for the future is of the essence of rational zoning. This court has on occasion required rezoning of neighboring properties when earlier rezoning decisions failed to assess future consequences.[3] The Davis statement was drawn from judicial decisions holding that, when there is no other reason to deny the requested rezoning, denial cannot be predicated upon an anticipated conflict between the property as rezoned and future development around it which is speculative to predict. Gust, 342 Mich. at 439-40, 70 N.W.2d at 773; West Bloomfield, 351 Mich. at 617, 88 N.W.2d at 382; Barney, 324 Mass. at 446-47, 87 N.E.2d at 14. In the case before us, the board of county commissioners could reasonably have concluded that the BH rezoning of the Reddicks' property would have a detrimental impact on substantial public and private interests "now," both in the sense of immediate consequences and in the sense of an immediately discernable portent of certain future harm.
It is appropriate to add a word distinguishing the circumstances in this case from those in Stokes v. City of Jacksonville, 276 So.2d 200 (Fla. 1st DCA 1973), Davis v. Sails, supra, Olive v. City of Jacksonville, 328 So.2d 854 (Fla. 1st DCA 1976), and Dugan v. City of Jacksonville, 343 So.2d 103 (Fla. 1st DCA 1977), in all of which this court ordered, or sustained a trial court which ordered, less restrictive zoning than that imposed by the zoning authority. In the aftermath of such a string of decisions it may erroneously be supposed that this court has lessened the effect of the "fairly debatable" rule, and has admonished circuit courts to zone and rezone in accordance with their notions of what "rational" zoning schemes may be. That is not the case. In Stokes a residential property was faced from three corners by three gasoline service stations. In Davis there were intrusive public developments including a sludge field. Ante n. 2. In Olive the residential *659 property was "a literal peninsula" in a sea of commercial usages. In Dugan the residence was confronted by convenience stores. Here, by contrast, the zoning authority separated commercial and noncommercial uses at a "physical barrier or other logical boundary," Olive, 328 So.2d at 856, the penetration of which would tend to produce the results decried in each of the cited cases. We previously have affirmed the judiciary's responsibility to ascertain the rationality of zoning classifications. We here reaffirm that the judicial task is not to determine proper zoning as a forum of first recourse, but is rather to determine, on the evidence before the court, whether the local authority's zoning decision is fairly debatable. As Judge Boyer wrote in Davis,
If the application of a zoning classification to a specific parcel of property is reasonably subject to disagreement, that is, if its application is fairly debatable, then the application of the ordinance by the zoning authority should not be disturbed by the courts. [318 So.2d at 217.]
The trial court's order for rezoning of the Reddick property displaces a thoughtful decision, on substantially debatable matters of local policy, by duly constituted local government. To sustain the judgment would be an unfortunate retrogression at a time when local governments are called on to act responsibly in restraining random development of land and other natural resources, or else give way to superseding power from the central executive or legislative branch of government. See Cross Key Waterways v. Askew, 351 So.2d 1062 (Fla. 1st DCA 1977), affirmed (Fla. 1978). All presumably would agree that the sensitivity of decisions affecting land use requires that those decisions be made, if possible, by local officials who are directly responsible to the local electorate. Absent arbitrariness, invidious discrimination, or confiscation in a constitutional sense, the judiciary should let those decisions stand. As our Supreme Court stated as recently as 1978, "zoning or rezoning is the function of the appropriate zoning authority and not the courts... ." Skaggs-Albertson's, supra, 363 So.2d at 1091.
Without prejudice to any application by the Reddicks to the board of county commissioners for more intensive noncommercial zoning than R-1A, the judgment is REVERSED and the cause DISMISSED.
ERVIN and MELVIN, JJ., concur.

Illustration to follow.
*660 
NOTES
[1] She testified that the property could be sold for more if rezoned commercial BH and:

[W]ho would want to live in a R-1A zoning on a road that has an interchange with 36,000 cars on it[?] It's impossible. It's impossible. Who wants it?
The witness' reference to 36,000 cars evidently was drawn from preliminary traffic projections for 1995, estimating that more than 38,100 vehicles per day would use Archer Road northeast of the interchange in accessing Gainesville's university and medical facilities.
[2] Davis sustained a circuit court order which required rezoning from agricultural to a zoning "`more liberal than single-family residential.'" 318 So.2d at 217. The acreage, which coincidentally was located on Tower Road in west Alachua county, was bounded on three sides by a school site, a mobile home subdivision development, and the site of a new sewage treatment plant with sludge field.
[3] Stokes v. City of Jacksonville, 276 So.2d 200 (Fla. 1st DCA 1973); Olive v. City of Jacksonville, 328 So.2d 854 (Fla. 1st DCA 1976).