302 So.2d 737 (1974)
SARASOTA COUNTY, Florida, et al., Appellants,
v.
Joseph V. BARG et al., Appellees.
Robert L. SHEVIN, as Attorney General of the State of Florida, Appellant,
v.
Joseph V. BARG et al., Appellees.
CASEY KEY PROTECTIVE ASSOCIATION et al., Appellants,
v.
Joseph V. BARG et al., Appellees.
Nos. 44028-44030.
Supreme Court of Florida.
April 19, 1974.
Rehearing Denied November 27, 1974.
*738 Richard E. Nelson, of Nelson, Stinnett, Surfus, Payne, Hesse & Cyril, Sarasota, for Sarasota County.
Robert L. Shevin, Atty. Gen., and Kenneth F. Hoffman, Asst. Atty. Gen., for Robert L. Shevin.
H. Lawrence Hardy, Tallahassee, of Bryant, Dickens, Rumph, Franson & Miller, Jacksonville, for Casey Key Protective Ass'n, appellants.
Samuel J. Swisher, of Kreag & Swisher, Sarasota, for Furbee, Carroll, Hanson, McLeod and Wright.
Henry P. Trawick, Jr., of Millican & Trawick, Sarasota, for Manasota Lands, Inc., appellees.
*739 ADKINS, Chief Justice:
On direct appeal we review a summary judgment of the Circuit Court of the Twelfth Judicial Circuit, in and for Sarasota County, which held Chapter 71-904, Laws of Florida, to be unconstitutional. Our jurisdiction vests by virtue of Florida Constitution, Article V, Section 3(b)(1), F.S.A.
Chapter 71-904 is a special act creating the Manasota Key Conservation District within Sarasota County. After establishing the District and defining the boundaries thereof, the Act contains the following provisions (quoted here in full because of the number and complexity of the constitutional challenges raised):
"Section 4. Density, uses and structures permitted within the district. No lands within the district shall be used for any purpose other than single family residential purposes. No structure shall be constructed within the district so as to exceed two (2) stories in height. Structural density within the district shall not exceed one (1) main residential building unit and one (1) guest house per fifteen thousand (15,000) square feet of lot area, together with other customary out-buildings, including boat houses, docks, and appurtenances thereto. No lands within the district shall be used for commercial or multi-family purposes. Commercial and multi-family structures shall not be constructed within the district. This section shall not render legally existing uses and structures unlawful.
"Section 5. Wildlife sanctuary. The area within the district is hereby declared to be a wildlife sanctuary, subject to protection as provided by the general laws of the State of Florida.
"Section 6. Marine life sanctuary. The area within the district is hereby declared to be a marine life sanctuary. Accordingly, no undue or unreasonable dredging, filling or disturbance of submerged bottoms shall be permitted; however, this shall not be construed to prohibit construction of boat basins and access channels when required permits are obtained. All persons within the district are encouraged to preserve and protect marine nursery and breeding areas. This section shall not be construed to prohibit sports or commercial fishing withing [sic] the district.
"Section 7. Unreasonable destruction of natural vegetation prohibited. The unreasonable destruction of natural vegetation within the district in a manner which would be harmful or significantly contribute to air and water pollution is prohibited within the district.
"Section 8. Board of appeals. In the event that any person owning real property within the district shall question the application or interpretation of this act of his lands or his intended use of same, the building of any structure, the dredging or filling of any lands or the destruction of any natural vegetation, then in that event said real property owner shall have the right and responsibility to file a petition with the governing body of Sarasota County, requesting an interpretation of this act as same applies to said property owner and his lands. The governing body of Sarasota County shall, within thirty (30) days after the filing of said petition, appoint a board of appeals consisting of not less than five (5) nor more than nine (9) owners of real property within the district who are sui juris, twenty-one (21) years of age or older and citizens of the United States of America. Said board of appeals shall convene within thirty (30) days from the date of its appointment at the Sarasota County court house in Sarasota, Florida, for the purpose of considering said petition and granting or denying the relief requested therein. The members of the board will serve without compensation.
"Upon the appointment of the members of the board of appeals, the governing body of Sarasota County shall cause a copy of said petition, together with the names and addresses of each member of the board of appeals to be furnished by *740 certified mail to each and every real property owner within the district according to the latest tax assessment roll on file with the tax assessor of Sarasota County, Florida.
"The meetings of the board of appeals shall be open to the public and the notice of the time and place of any meeting at which the board of appeals shall consider evidence and act upon the petition of a real property owner shall be published one (1) time in a newspaper of general circulation in Sarasota County at least fifteen (15) days before the date of said meeting, and the concerned property owner shall likewise receive at least fifteen (15) days notice by certified mail of the time and place of said meeting.
"The publication costs and the cost of providing notices by certified mail shall be paid by the petitioning property owner by depositing same with the governing body of Sarasota County at the time of the filing of his petition. Any surplus in the cost deposit shall be refunded and any deficiency shall be paid by said property owner.
"The board of appeals shall elect a chairman and other appropriate officers deemed necessary by said board for the proper conducting of its business. The board of appeals shall conduct its hearings on any petition in accordance with the requirements of chapter 120, Florida Statutes, known as the Florida administrative procedures act, as said act may from time to time be amended.
"The board of appeals shall evidence its decision on any petition by the adoption of an appropriate resolution. Should the petitioning property owner be aggrieved by the decision of the board of appeals, said property owner may, within ninety (90) days after the adoption of said resolution, seek review of the action of the board of appeals in a court of competent jurisdiction within Sarasota County.
"Upon the adoption of a resolution disposing of a property owner's petition, the duties of the board of appeals shall be deemed discharged, and said board will thereupon stand dissolved, it being the intent of this act to require the appointment and functioning of a new and separate board of appeals to act upon each and every petition of a property owner; however, nothing herein contained shall prevent the appointment of otherwise qualified real property owners within the district to serve upon successive board [sic] of appeals, and the simultaneous appointment and functioning of more than one board of appeals is hereby specifically authorized.
"Section 9. Judicial relief. Any owner of real property within the district who determines that his property rights have been adversely affected by the provisions of this act may seek relief in any court of competent jurisdiction in Sarasota County, Florida, provided said real property owner had exhausted his administrative remedy by seeking relief through the filing of a petition with the board of appeals in accordance with section 8 hereof.
"Section 10. Enforcement. Any owner of real property within the district may enforce the provisions of this act or enjoin the violation of same by appropriate civil proceedings in any court of competent jurisdiction in Sarasota County, Florida. In order to enforce the provisions of this act and to enjoin a violation of same, a real property owner need not allege or prove that the concerned violation of this act will adversely affect the property rights of said real property owner to any greater extent or different degree than it will affect any other real property owner within the district. A civil action for the enforcement of this act may include, but shall not be limited to a suit for an injunction, including temporary and mandatory forms of injunction. A real property owner who is successful in his efforts to enforce this act, or any portion of same, through civil proceedings, shall be awarded his court costs, *741 together with a reasonable attorney's fee to be assessed as a judgment against the person or persons determined by the court to have violated this act. Said judgment may be collected in the same manner and in accordance with the procedure for the collection of other civil judgments under the laws and rules of civil procedure in the State of Florida. No action by the board of appeals shall be required as a condition precedent to enforcement of this act pursuant to this section.
"Section 11. Construction. This act shall not be construed as limiting or repealing the application of any law or regulations dealing with the subject of zoning, conservation and air and water pollution standards; but in the event that any of the standards of protection specified by this act shall be more restrictive that those specified in such other law or regulation, the standards specified by this act shall prevail, it being the specific intent of this act to provide for and apply such zoning, conservation and air and water pollution standards as will be the most protective of the natural beauty, marine and wildlife of the area. If any section, sentence, clause, phrase or word of this act is for any reason found or declared to be unconstitutional, inoperative or void, such holding of invalidity shall not affect the remaining portions of this act; and it shall be construed to have been the legislative intent to pass this act without such unconstitutional, invalid or inoperative part therein; and the remainder of this act, after the exclusion of such part or parts, shall be deemed and held to be valid as if such part or parts had not been included therein.

......
"Section 13. Referendum. This act shall take effect only upon its approval by a majority of the electors who reside within said proposed district voting in a referendum election to be held in Sarasota County at a special election to be called by January 1, 1972. In the event such election is not held as authorized and provided, this act is void and of no effect."
This cause began with the appellees' filing of a complaint for declaratory judgment seeking a determination of the constitutionality of Chapter 71-904. The appellees are owners of land located within the District created by the Act, and they challenged the constitutionality of the Act on nine separate grounds. The order of the Circuit Court holding the Act unconstitutional referred to several provisions of the Act and found them violative of general constitutional requirements. The allegations of the complaint were somewhat vague and unspecific; however, we will examine each section of the Act in light of all the various constitutional provisions cited in the complaint. In so doing, we bear in mind the presumption of validity we must accord all legislative enactments. Because of this presumption, "It has long been the policy of this court in the interpretation of statutes where possible to make such an interpretation as would enable the Court to hold the statute constitutional." Rich v. Ryals, 212 So.2d 641 (Fla. 1968).

SECTION 4
The appellees asserted that Section 4 of the Act, by limiting the uses to which they may put their lands and the structures they may construct thereon, deprives them of their property without due process of law. We find this assertion to be without merit. Section 4 of the Act does not deprive appellees of their property, or of the use of their property; it simply regulates the use of that property. Reasonable restrictions upon the use of property in the interest of the public health, welfare, morals, and safety are valid exercises of the State's police power. E.g., City of Miami Beach v. Ocean & Inland Company, 147 Fla. 480, 3 So.2d 364 (1941). The restrictions imposed by Section 4 of the Act are reasonable, in light of the legislative intent  expressed in Section 1 of the Act  to preserve the natural beauty of Manasota Key.

*742 SECTIONS 5, 6 and 7
Sections 5, 6 and 7 also attempt to regulate the use of property within the District established by the Act. Appellees contend, however, that these Sections are vague and uncertain and are an unconstitutional delegation of legislative authority to the administrative and judicial agencies charged with applying and enforcing the provisions of the Act. As this Court stated in Conner v. Joe Hatton, Inc., 216 So.2d 209 (Fla. 1968):
"When [a] statute is couched in vague and uncertain terms or is so broad in scope that no one can say with certainty, from the terms of the law itself, what would be deemed an infringement of the law, it must be held unconstitutional as attempting to grant to the administrative body the power to say what the law shall be. ..."
The State argues that the reference in Section 5 to "the general laws of the State of Florida" may be read into Sections 6 and 7 as well, and that the general laws of the State concerning wildlife sanctuaries, marinelife sanctuaries, and air and water pollution eliminate any apparent ambiguities in these Sections. Our research, however, has unearthed no Florida statute which defines `wildlife sanctuary' or which provides protection to animals located in areas denominated as such. Therefore, all that Section 5 of the Act does is declare Manasota Key to be a wildlife sanctuary. It does not, even by reference, provide that wildlife on Manasota Key be protected or treated any differently than in any other area of the State.
Similarly, the first sentence of Section 6 simply denominates Manasota Key as a marinelife sanctuary. It does not define that term or attempt to regulate any conduct with respect to marine life located there, and there does not appear to be any Florida statute which could conceivably be incorporated into this sentence to give it any substantive effect. The last two sentences of Section 6 also contain no restriction or regulation of any conduct or activities within the District. These sentences simply `encourage' the protection of marine nursery and breeding areas and provide that the designation of the District as a marinelife sanctuary shall not be construed to prohibit any fishing within the District.
The second sentence of Section 6 does attempt to prohibit certain activities within the District, specifically, "undue or unreasonable dredging, filling or disturbance of submerged bottoms". Similarly, Section 7 attempts to prohibit "unreasonable destruction of natural vegetation" which would be "harmful" or which would "significantly contribute to air and water pollution". The Act, however, does not provide us with any definition of `undue', `unreasonable', `harmful', or `significantly contribute'. The Act does not contain any standards or guidelines to aid any court or administrative body in interpreting these terms. The determination of what conduct falls within the proscription of these ambiguous provisions is left to the unbridled discretion of those responsible for applying and enforcing the Act. This amounts to an unrestricted delegation of legislative authority, in violation of the Florida Constitution, Article II, Section 3, F.S.A.
It is argued by the State that the Legislature has provided explicit guidance for what it considers to be "undue or unreasonable" dredging or filling and "unreasonable destruction of natural vegetation" in numerous other Florida statutes. The State specifically refers to Florida Statutes, Chapter 403 (Florida Air and Water Pollution Control Act) and those provisions of Florida Statutes, Chapter 253, which regulate dredging and filling activities within the State. (Florida Statutes, Chapter 370, also contains provisions regulating these activities.) What this argument amounts to, then, is that the Legislature, in enacting Section 7 and the second sentence in Section 6, simply and fruitlessly intended to say, "The general statutes of the State relating to dredging, filling, and *743 air and water pollution apply on Manasota Key  just as they do everywhere else in the State."
We do not agree that the Legislature intended to enact such useless and redundant provisions, for two reasons. First, in Section 8 of the Act the Legislature established a Board of Appeals to decide questions on the application and interpretation of the Act. Such a provision is inconsistent with a legislative intent to simply reiterate the applicability of Florida Statutes, Chapters 253, 370 and 403, F.S.A., for each of those chapters provides, in great detail, for other administrative agencies to interpret and enforce their provisions. Second, in Section 11 of the Act the Legislature stated that,
"in the event that any of the standards of protection specified by this act shall be more restrictive than those specified in [other laws or regulations], the standards specified by this act shall prevail, it being the specific intent of this act to provide for and apply such zoning, conservation and air and water pollution standards as will be the most protective of the natural beauty, marine and wildlife of the area."
The legislative intent, therefore, was to establish standards more restrictive than those contained in other Florida laws, and to create a Board of Appeals to interpret and apply the more restrictive standards applicable on Manasota Key. However, since the Legislature has failed to specify what these more restrictive standards are and has failed to provide any guidelines to aid the Board of Appeals in establishing such standards, the ambiguous provisions of Sections 6 and 7 of the Act do not comport with constitutional requirements.
We hold, therefore, that Section 7 of the Act and the second sentence of Section 6 are unconstitutional and cannot be reasonably interpreted so as to avoid that result. Section 5 and the remainder of Section 6 are constitutional as interpreted herein. We note that these Sections, although ineffectual as we have interpreted them, might eventually have great substantive effect if and when the Legislature passes general statutes defining `wildlife sanctuary' and `marinelife sanctuary' and prescribing regulations for areas designated as such.

SECTIONS 8, 9 AND 10
Considering those sections of the Act dealing with its interpretation and enforcement, we note at the outset that there is virtually nothing in the Act to be enforced. Only in Section 4 is there any effective regulation or restriction which could be enforced within the District. Section 4, however, is no more than an addition to the zoning laws of Sarasota County. Applications for building permits from the county, for example, must conform to Section 4 within the District. There are procedures established by general law for enforcement, by the county, of zoning regulations; for the determination of questions relating to application and interpretation of zoning regulations by the county's Board of Adjustment; and for judicial review of decisions of the Board of Adjustment.
Sections 8, 9 and 10 of the Act establish a different procedure for the application, interpretation and enforcement of Section 4 than that provided by general law with respect to other zoning regulations in force in Sarasota County. As just one example, Section 8 provides that judicial review of a decision of the Board of Appeals may be obtained within ninety days, as opposed to the thirty days provided by Florida Statutes, § 176.16, F.S.A., and the Florida Appellate Rules, 32 F.S.A., for review of a decision of the Board of Adjustment. We perceive no rational or reasonable basis for a distinction between the procedure regarding one zoning regulation and that with respect to all other zoning regulations applicable in Sarasota County. Such a distinction, therefore, violates the equal protection clause of the *744 Fourteenth Amendment to the United States Constitution. Similarly, Sections 8, 9 and 10 cannot be interpreted as providing a procedure in Manasota Key for the application, interpretation and enforcement of general laws relating to dredging and filling activities and air and water pollution which is different than the procedure established in those laws for the State as a whole.
We are left, then, with three more sections of the Act which are ineffectual unless and until the Legislature enacts laws defining and regulating wildlife and marine-life sanctuaries. Several questions raised by the appellees below concerning the constitutionality of Sections 8, 9 and 10 cannot, therefore, be addressed until any such future legislation is before the Court and the relationship between any interpretation and enforcement provisions contained therein and those of the Special Act can be considered. There are, however, two questions raised below which we can dispose of at this time.
Appellees contend that the provisions of Section 10 allowing an award of court costs and attorney's fees to a successful plaintiff who brings suit to enforce the Act are in violation of the Fourteenth Amendment to the United States Constitution because an award of costs and fees is not also allowed for a successful defendant. The question is controlled by this Court's decision in Hunter v. Flowers, 43 So.2d 435 (Fla. 1949), and these provisions are not unconstitutional. Every owner of real property within the District may, under Section 10, bring suit to enforce the provisions of the Act, and an award of costs and attorney's fees is allowable to each owner on the same basis. Likewise, every owner against whom a suit is filed under Section 10 is treated similarly.
Appellees also contend that the Act violates Article III, Section 11(a)(7), Florida Constitution, F.S.A., in that it establishes a condition precedent to bringing a civil action in a court of law. The Constitution specifically prohibits special laws pertaining to such conditions. Section 9 of the Act appears to violate this constitutional provision, by requiring owners of property within the District to exhaust the administrative remedy provided in Section 8 before seeking relief in a court of law. This Section, however, does not establish any conditions precedent to bringing an original civil action. Read in conjunction with Section 8, Section 9 simply provides for judicial review of an administrative decision. A Special Act of this nature does not fall within the constitutional proscription of Article III, Section 11(a)(7).

SECTION 13
Appellees assert that the referendum section of the Act is unconstitutional because the vote was limited to electors who resided within the proposed District, citing Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972). This argument is without merit. Dunn v. Blumstein, supra, did not hold that residency requirements in general were unconstitutional, but that unreasonable durational residence requirements were. The Court stated, at 405 U.S. 343, 92 S.Ct. 1003:
"... We emphasize again the difference between bone fide residence requirements and durational residence requirements. We have in the past noted approvingly that the States have the power to require that voters be bona fide residents of the relevant political subdivision. [Citations omitted.] An appropriately defined and uniformly applied requirement of bona fide residence may be necessary to preserve the basic conception of a political community, and therefore could withstand close constitutional scrutiny. [Footnote omitted.] But durational residence requirements, representing a separate voting qualification imposed on bona fide residents, must be separately tested by the stringent standard. [Citations omitted.]"
*745 Appellees also contend that the referendum section unconstitutionally limits the vote to property owners, citing Phoenix v. Kolodziejski, 399 U.S. 204, 90 S.Ct. 1990, 26 L.Ed.2d 523 (1970), and Cipriano v. City of Houma, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969). The terms of the Special Act, however, do not limit the vote to property owners within the District, but to electors, and it does not appear in the record that the vote in the referendum actually was limited to property owners. Even if the vote had been so limited, the cited cases would not require that the referendum be held unconstitutional. Both of those cases involved bond validation referendums, and it was not held that a voting distinction between property owners and non-property owners was invalid per se. The United States Supreme Court held that the burdens and benefits of the issues submitted to the voters fell upon property owners and non-property owners alike and that there was, therefore, no valid basis for the voting distinction in those cases. In the instant case, the burdens and benefits of the Special Act appear to affect primarily  if not exclusively  property owners within the proposed District. A voting distinction, therefore, if it had been made, would have been proper.

CONCLUSION
We have found to be unconstitutional only Section 7 of the Act and the second sentence of Section 6. The remainder of the Act is valid and operative, pursuant to the legislative intent expressed in Section 11. Sections 5, 6, 7, 8, and 9 have been strictly interpreted so as to avoid constitutional infirmities. All constitutional questions raised by the appellees having been decided, except for those relative to Sections 8, 9 and 10 which must await the enactment of future legislation effectuating those provisions, the judgment of the Circuit Court for Sarasota County is reversed in part and affirmed in part, as indicated herein.
It is so ordered.
ROBERTS, McCAIN and CARLTON (Retired), JJ., concur.
ERVIN, J., concurring in part and dissenting in part with opinion, in which BOYD, J., concurs.
ERVIN, Justice (concurring in part and dissenting in part):
Ch. 71-904, Special Acts of Florida 1971, is valid in toto. I would uphold the second sentence of Section 6 and all of Section 7.
These provisions of the Act held unconstitutional are no more unconstitutional for vagueness and overbreadth than are certain penal acts of the Legislature with reference to obscene language, obscene exposure and obscene material or disorderly conduct. Cf. Gonzales v. City of Belle Glade, Fla., 287 So.2d 669, Opinion filed Dec. 20, 1973; State v. Mayhew (Fla. 1973), 288 So.2d 243; Smith v. State (Fla. 1970), 237 So.2d 139; Orlando Sports Stadium, Inc. v. State ex rel. Powell (Fla. 1972), 262 So.2d 881, 884; Chesebrough v. State (Fla. 1971), 255 So.2d 675, and Little v. State (Fla. 1973), 278 So.2d 611. It is puzzlingly incongruous in this Court's decisions concerning statutory vagueness that the cases just cited give a liberal construction to penal statutes affecting personal liberty but in cases such as the instant case statutes regulating property rights are given a strict construction. Cf. Mahon v. County of Sarasota (Fla. 1965), 177 So.2d 665.
The invalidated provisions of the Act should not be read in isolation but to understand their intent should be considered in connection with the findings of fact (Section 1 of the Act) which state the object of the statute is "to preserve the natural beauty, marine, animal and bird life of said area." These provisions should also be read in conjunction with the intent and purpose of general laws of the state providing for wild life and marine life protection and sanctuary, and those relating to bulkheading, filling and dredging of submerged bottoms. All of the body of general *746 law relating to those subjects and authoritative interpretative precedents thereon are contemplated to be taken into account by the special act's definitive language.
The words, "unreasonable destruction of natural vegetation," are confined to that which "would be harmful or significantly contribute to air and water pollution ... in the district." Section 7.
It is generally agreed by the weight of authority that such regulatory administrative language as contained in Sections 6 and 7 of the Act is constitutionally sufficient under modern statutory interpretations.
"It is not necessary that the legislature supply administrative officials with a specific formula for their guidance in a field where flexibility and the adaptation of the legislative policy to infinitely variable conditions constitute the essence of the program. The modern tendency is to be more liberal in permitting grants of discretion to administrative agencies in order to facilitate the administration of laws as the complexity of economic and governmental conditions increases. In other words, the necessities of modern legislation dealing with complex economic and social problems have led to judicial approval of broad standards for administrative action; detailed standards are not required, especially in regulatory enactments under the police power... ." 1 Am.Jur.2d Administrative Law § 118, p. 925.
"In many cases the courts have held that the rule requiring that a standard or rule of action be prescribed in a statute or ordinance conferring discretionary authority upon an administrative agency was sufficiently complied with, and the following legislative specifications are among those which have been held to state a sufficiently definite standard for administrative action in specific fields: `necessity,' `need,' `necessary or expedient,' `appropriate,' `reasonable,' `just and reasonable,' `fair and equitable,' `sufficient,' `excessive profits,' `unduly complicated corporate structures and inequitable distributions of voting power,' `fit' or `unfit,' `suitable,' `unsuitable,' `competency, ability, and integrity,' illuminating oil which is `safe, pure, and affords a satisfactory light,' `worthy cause,' `decency and good order,' `substantial,' `undesirable residents,' `undesirable business practices,' `unprofessional conduct,' `false, fraudulent, or misleading advertising,' `improper conduct,' `misconduct,' `offensive because of injurious and obnoxious noise, vibrations, smoke, gas,' and other factors, `injurious substances,' and `danger to peace or safety.'" 1 Am.Jur.2d Administrative Law § 119, p. 927-28.
The condemned language in Ch. 71-904 is sufficiently clear to be understood by the generality of citizens of average intelligence. In commonsense understanding this language means that it is wrong for anyone to despoil for private purposes the natural condition of the submerged lands and vegetation in the district by disturbing, ravaging, or uprooting the same to the degree that they no longer bear any reasonable semblance to their natural state. The cutting down of trees and the chopping out of vegetation and the dredging of foreshore areas or filling thereof to an extent that materially impairs or destroys the original vegetation condition or natural shore frontage status would appear to be prohibited by the Act.
In cases of doubt administrative or judicial rulings should be first obtained to determine whether proposed changes for private purposes in the vegetation or submerged area would materially affect the existing natural condition of the area to the degree inimical to the intent of the Act. The police power may be utilized to insure a harmonious dovetailing of both the private and public interests in preserving the natural status of the things contemplated in the Act.
*747 When an area is uniquely scenic and has the rare natural quality of serving as a haven or refuge for marine, animal and bird life it may well be the subject of legislative protection under the state's police power. The Legislature has found (Section 1 of the Act) that Manasota Key has "the natural beauty, marine animal life and bird life" that merits police power protection. This Court under principles of law relating to judicial restraint should defer to this legislative finding.
Unless the police power protection extends far enough to prevent the "unreasonable destruction of natural vegetation" (Section 7) and the "unreasonable dredging, filling or disturbance of submerged bottoms" (Section 6) (emphasis supplied) the chief objectives of the Act to preserve "the natural beauty, marine, animal life and life are completely thwarted. In other words, to call a spade a spade, the key purposes of the Act are "gutted."
Numerous concepts and precedents support the constitutionality of the Act. It is almost supererogation to call attention to them because they have been so long and firmly structured into the law for promotion of the public welfare.
The U.S. Army Corps of Engineers has long been authorized to take into account environmental factors in navigable water areas. Zabel v. Tabb, 430 F.2d 199 (C.A.5, 1970) cert. den. 401 U.S. 910, 91 S.Ct. 873, 27 L.Ed.2d 808 (1971).
Rents which are "unreasonable" may be subject to statutory control. Levy Leasing Co. v. Siegel (1922), 258 U.S. 242, 42 S.Ct. 289, 66 L.Ed. 595.
"Unreasonable waste of natural gas" by owners of oil and gas producing lands may be controlled by law. Bandini Petroleum Co. v. Superior Court (1931), 284 U.S. 8, 52 S.Ct. 103, 76 L.Ed. 136.
Impossible standards are not required. McArthur v. State (Fla. 1966), 191 So.2d 429; United States v. Petrillo, 332 U.S. 1, 67 S.Ct. 1538, 91 L.Ed. 1877.
"Unreasonable destruction" is no more difficult to ascertain than "unreasonable speed" or "unreasonable rent." The board of appeals provided by the Act similarly as a jury of one's peers is presumed to have a common understanding of reasonableness within the intendment of the Act.
Restriction of the use of one's property to promote the public welfare is an accepted principle of the law. Myriad cases so hold. E.g., City of Miami Beach v. Ocean and Inland Co. (1941), 147 Fla. 480, 3 So.2d 364; In Re Seven Barrels of Wine, 79 Fla. 1, 83 So. 627 (1920); Dutton Phosphate Co. v. Priest, 67 Fla. 370, 65 So. 282 (1914); Euclid v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303, and City of Miami Beach v. Texas Co., 141 Fla. 616, 194 So. 368, 128 A.L.R. 350.
Promotion of aesthetics may well be the object of legislation. The state's outdoor advertising or billboard set back law was upheld in Hav-A-Tampa Cigar Co. v. Johnson, 149 Fla. 148, 5 So.2d 433.
Protective environmental legislation is meeting judicial approval. See Arizona v. Sanner Contracting Co., 109 Ariz. 522, 514 P.2d 443.
The Court majority, quite contrary to the great weight of authority on the principal issues in this litigation, has again failed to lend its judicial support to an effort to protect Florida's scenic beauty and natural resources, which protection is increasingly necessary. Cf. The City of Daytona Beach v. Tona-Rama, Inc., 294 So.2d 73. Opinion filed March 25, 1974.
BOYD, J., concurs.