374 So.2d 1143 (1979)
CONTEXT DEVELOPMENT COMPANY, a Florida Corporation, Appellant,
v.
DADE COUNTY, Florida, Etc., et al., Appellees.
Nos. 77-2013, 78-599.
District Court of Appeal of Florida, Third District.
September 18, 1979.
Brigham, Reynolds, Byrne & Moore, Miami, and Gideon Kanner, Los Angeles, Cal., for appellant.
Stuart L. Simon, County Atty., and Clifford A. Schulman, Asst. County Atty., for appellees.
Before KEHOE and SCHWARTZ, JJ., and CHARLES CARROLL, (Ret.), Associate Judge.
KEHOE, Judge.
Appellant, petitioner below, brings these consolidated appeals (hereinafter referred to as appeal) from two orders entered by the trial court; one order dismissed with prejudice its complaint for declaratory and injunctive relief, the other denied its petition for writ of certiorari. We reverse.
Appellant was served with a cease and desist order issued by the Director of the Department of Environmental Resources Management, Metropolitan Dade County, Florida (hereinafter referred to as DERM). This order reads in pertinent part as follows:
"It has come to my attention that the Context Development Company in conjunction with the Aerojet General Corporation have submitted applications for tree removal permits, and have stated in said applications that the following areas are to be farmed:
Aerojet Corp. (Applications for Aerojet made by Context)

*1144 "Sections 11-12-13-14 and the E 1/2 of Section 10 and the E 1/2 of Section 15 all in Township 57 Range 37.
Context Development Company
"Sections 1-2-3-4-5-6-7-8-9, the W 1/2 of Section 10 and the W 1/2 of Section 15 all in Township 57 Range 37 and the W 1/2 of Section 6 Township 57 Range 38 along with the SW 1/4 of Section 31 Township 56 Range 38.
"As you are aware, said sections of land are also known as Taylor's slough, an area of extreme ecological sensitivity, inasmuch as the pinnacle porous rock formations natural to Taylor's slough act environmentally as:
A filtering system
A prime water shed storage area
A prime recharge area
"Supplying the Everglades National Park with the water necessary to protect and maintain its plant and animal life of all kinds, and inasmuch as inspections have revealed you have already commenced to upset the ecological balance of said Taylor's slough by `rock ploughing' the east 1/2 of Section 7 of Township 57 Range 37.
"I am, therefore, pursuant to the authority granted in Section 24-5(16) and in 24-37(2), Pollution Control Ordinance, which states, `when in the judgment of the Director, Environmental Resources Management, the illegal operation of any facility or equipment threatens serious damage to aquatic life and property', ordering you to:
On receipt of this notice "Cease and Desist" from any further "rock ploughing" in the E 1/2 of Section 7 and/or any operation in any of the enumerated sections of land in Taylor's slough that could result in altering said land in any way whatsoever.
Until such time as you:
Submit to the Director, Environmental Resources Management, an environmental impact statement for review and study and obtain approval to commence operations again from all governmental agencies concerned.
Or:
We will file charges against the Context Development Company and against you as the responsible individual in both County and Circuit Court for each day that inspections reveal you continue to operate.
"Please note that in County Court while a corporation can be fined up to $500, the same charges against the individual can result in sixty (60) days in jail, and in Circuit Court the civil penalties can result in fines up to $5000 for failing to comply with a lawful order of the Director, Environmental Resources Management, in addition to the costs of restoring the affected land to its original condition.
"Please govern yourself accordingly."
Thereafter, appellant appealed this order to the Metropolitan Dade County Environmental Quality Control Board (hereinafter referred to as Board). After a hearing, the Board issued an order affirming DERM's cease and desist order. The Board's order reads, in pertinent part, as follows:
"THIS MATTER came on to be heard before the Board on the appeal of Context Development Company from a March 18, 1976 Order of the Director of Environmental Resources Management to `Cease and Desist' further `rock plowing' operations in conjunction with farming activities being done in Dade County, Florida. The Director's order alleged that actual work being done and contemplated for the future was in violation of Chapter 24 of the Code in an ecologically sensitive area of Dade County identified as Taylor Slough, a prime water shed and water recharge area of West Dade County. The Director alleged in his Order that these activities were and would continue to threaten the potable water supply of Dade County and the supply of fresh water to Everglades National Park and its related estuarine systems, if permitted to continue. The Director, therefore, ordered the cessation of these activities, pursuant to his authority under Section 24-5(16) of the Dade County Code until submission of an Environmental Impact *1145 Statement or other evidence of ability of Context to comply with the Code. Context, in a timely manner, appealed this action of the Director pursuant to Section 24-6 of the Dade County Code. After several requests for continuances were applied for and granted to Context, the matter was heard before the Board on August 26, 1976; September 16 and 23rd, 1976; December 9, 1976; and January 13, 1977.
"The record of these proceedings is voluminous and encompasses the testimony of approximately 15 witnesses and the submission of approximately 30 exhibits. These exhibits included photographs, slides, films, videotapes, and other documents and records relevant to this cause. In all, the Board has heard and considered approximately 900 pages of testimony and arguments of counsel regarding the rock plowing and agricultural use of this 8,100 acres of environmentally sensitive land, and has spent many hours considering the premises. Counsel for both the Director and the Appellant have also been given the opportunity to fully argue and brief the subject matter herein concerned and have prepared their respective versions of the issues that they discern to be necessarily and properly determined by the Board.
"The Board does not believe that an extensive recapitulation of the testimony and the facts presented to the Board would be helpful at this juncture. Both the memorandum of trial testimony and brief of the Director and Context more than ably summarized the multitude of facts and evidence presented before the Board during the course of these hearings. The Board, therefore, incorporates by reference in this order the transcripts of testimony, exhibits, briefs, memoranda and other records and documents presented to it as a part of this order, in toto.
"Counsel for the Board has advised, and we agree, that three main issues may be decided by the Board in arriving at its ultimate decision in this cause. Each issue will be discussed below.
"Initially, this Board was called upon to determine whether the Director has met his burden of proof in showing that violations of Chapter 24 of the Code have occurred and can reasonably be anticipated to continue by the actions and plans of Context. In this regard, counsel for the Board has noted that the Director must have presented a preponderance or greater weight of the competent and substantial evidence in support of his action in order for his Order to be upheld.
"Without doubt, the evidence presented by the Director is far from conclusive as to the actual impact of this 8,100 acre development on the waters of the County, both surface, tidal and underground. All witnesses, including Context, acknowledge that more information is necessary before any degree of `certainty' can be achieved. However, certain of the matters presented are without dispute. Thus, the Board notes that damage to the natural environment of this area, once accomplished, could take anywhere from ten years to centuries to repair if such a repair is possible at all. In fact, such damage once permitted would in all probability be irreversible in impact. The Board believes that the Director has more than ably shown by the greater weight of the competent and substantial evidence that violations of Chapter 24 of the Dade County Code, and more specifically noted in the Director's Statement of Issues before the Board, has occurred and can reasonably be anticipated to continue to occur by and through the continued rock plowing and proposed agricultural use of Context land that is the subject matter of this cause.
"The Board has also considered whether or not the Director's Order was over broad in its geographic scope as more specifically stipulated by the parties to this cause. The Board believes that the parcels of land owned by Context and the subject matter of this cause, as appears of record herein, may very well be within the confines of Taylor Slough and its interrelated drainage basin. Once again, the exact boundaries of the Slough and *1146 its basin are not known with certainty. However, the Board believes that the Director has also shown by the greater weight of the evidence that the parcels covered by his Order are within the area of environmental sensitivity of concern to the Director and the Board.
"Finally, the Director's Order also does not ban rock plowing or farming in this area forever, but only until an Environmental Impact Statement can be prepared addressing the sensitivity of the area and the steps that could be taken to minimize or alleviate the environmental damage hereinbefore referred to and the violations of the Code that have already been found to have taken place. Context has questioned the authority of the Director to require an `Environmental Impact Statement' by them even though Context's own expert witness has noted the need for such a statement prior to initiation of rock plowing or farming of even one acre in this area. Nonetheless, Context contends that the Director's requirement of an Environmental Impact Statement calls for a certain type of formalized document beyond the power of the Director to request. The Board does not so construe this requirement. The Board views the term Environmental Impact Statement, as used by the Director, in the lower case sense. Thus, the Board does not construe the term as utilized to require any particular type of formalized document or presentation but does require an environmental study or the presentation of other evidence or data that would indicate that the activities of the Appellant would not violate Chapter 24 of the Dade County Code with the attendant results that have been previously mentioned. Up until this point in time, Context has been unable to present to the Director or the Board such data that is more persuasive or of convincing force and effect to show that violations of Chapter 24 have not and will not continue to occur by their proposed activities. Until the submission of such a statement or other evidence the Cease and Desist Order of the Director must be upheld."
From this order, appellant filed a petition for writ of certiorari in the circuit court. Approximately four months later, appellant also filed a complaint for declaratory and injunctive relief in the circuit court alleging and seeking the inverse condemnation of their property which was the subject of the cease and desist order. Upon appellee's motion to dismiss, the circuit court dismissed with prejudice appellant's complaint for declaratory and injunctive relief. Thereafter, the circuit court denied appellant's petition for writ of certiorari. The order denying the petition reads in pertinent part as follows:
"THIS MATTER came on to be heard on the petition for Writ of Certiorari of Context Development Company, seeking review of an Order of the Dade County Environmental Quality Control Board affirming an Order to Cease and Desist issued by the Director, Department of Environmental Resources Management, of Metropolitan Dade County. Said Cease and Desist Order prohibited Context from `rockplowing' and preparing for agricultural use approximately 8,100 acres of land until such time as Context prepared and submitted an environmental impact study or such other evidence to show that the proposed activity would not result in violation of Chapter 24 of the Dade County Code.
"Upon appeal by Context, the Dade County Environmental Quality Control Board held extensive evidentiary hearings in this matter and the record before the Court consists of 900 pages of testimony, 15 witnesses, 30 exhibits, including photographs, slides, films, video tapes and other documents. The evidence before the Board showed that Context Development Company sought to and was in the process of rockplowing certain lands located in Taylor Slough, a wetland area directly adjacent to Everglades National Park. Petitioner, in addition to active rockplowing operations in conjunction with proposed agricultural activities, also sought continuation of this activity and the scarification of a total of 8,100 acres of land in Taylor Slough.

*1147 "Taylor Slough constitutes a prime watershed area for surface water moving out of its geographic limits and into Everglades National Park, Florida Bay and their related estuarine system. In addition, the evidence reflected that the Slough also acted as a filtration system and water recharge area for the fresh waters of the Biscayne Aquifer, the prime potable water supply source for Dade County's public water supply. Without doubt, the evidence reflects the areas of Taylor Slough that are the subject matter of this cause are inundated for the large portion of the year and are covered by a blue-green algal mat, also known as periphyton. This mat plays an important part in the life cycle of the Everglades National Park environment, the Florida Bay estuarine system and in the continued supply of clean, non-polluted potable water necessary for the population of Dade County. The evidence showed that the mat filters out polluting particulate matter; contributes organic materials to the soil; contributes through the process of photosynthesis, to the aquatic and biotic chains of life in the ecosystem; contributes physical support for many plants and animals within the environment; and acts as a filter for the sun's rays which allow the productivity of the soil to be maintained. The evidence also reflects, without question, that rockplowing activities remove this mat structure and, thereby, eliminate the functioning of one of the basic elements of the entire ecosystem. Moreover, the evidence reflected that agricultural activity would result in the discharge of various fertilizers, nutrients, barbicides, fungicides and other organic and inorganic materials and chemicals into the soil and waters of the Slough, both surface and underground.
"The evidence and testimony before the Board also showed that the surface and underground waters of Taylor Slough and its adjoining areas are integrally related and the movement of the water is out of the confines of Petitioner's property with eventual impacts on the ecosystems `downstream' in Everglades National Park, Florida Bay and their related estuarine systems and/or in the Biscayne Aquifer, the prime water supply source for Dade County.
"The Board had before it competent and substantial evidence to support the proposition that the removal of the blue-green algal mat and the introduction of organic and inorganic matter and chemical compounds into the waters of the Slough would be deleterious in effect and would significantly threaten the multitude of animal, plant, fish and other aquatic life and/or property and would constitute a danger to the human population of Dade County through its potable water supply.
"Although a necessary prerequisite to any development in the area, no prior environmental studies were done by Context prior to engaging in rockplowing and farming operations involved in the instant cause and no such studies were contemplated by Petitioner at the time of hearing in this matter.
"Once scarified, according to the testimony of Context's own expert witness, the land involved would take between decades and entireties to regenerate, if it could regenerate at all.
"Based upon the Briefs submitted in this case, the record made before the Environmental Quality Control Board and the arguments of counsel, the Court makes the following findings:
"1. The Order of the Environmental Quality Control Board of Metropolitan Dade County affirming the Order to Cease and Desist of the Director of Environmental Resources Management was supported by competent substantial evidence and the Court will not substitute its judgment for that of the administrative tribunal. De Groot v. Sheffield, 95 So.2d 912 (Fla. 1957).
"2. That Sections 24-3(14) and (31) of the Dade County Code are constitutional on their face and as applied to this matter and sufficiently denote the prohibited acts of creating or maintaining a `nuisance' and/or `water pollution' and were *1148 a sufficient basis upon which the Director and the Board could act in issuing and affirming the cease and desist order. Maher v. City of New Orleans, 516 F.2d 1051 (5th Cir.1975); State v. Dye, 346 So.2d 538 (Fla. 1977).
"3. Review of the mandated environmental impact statement or other evidence is subject to adequate guidelines since the Director must be guided by generally accepted concepts and standards of the particular professional discipline concerned, pursuant to Section 24-5(22) of the Code of Metropolitan Dade County.
"4. That the action of the Environmental Quality Control Board does not constitute a `taking' of Petitioner's property calling for either reversal or compensation since it temporarily prohibits only one specific proposed use of the property until appropriate and necessary environmental studies can be accomplished to assure the proposed activity will not detrimentally impact on the public of Dade County.
"5. Petitioner has no vested right, by deed, or zoning, to maintain its land or proposed activity in such a way as to damage or injure the rights of the public through the creation or maintenance of a public nuisance and Petitioner is not exempt from the exercise of the police power to abate or prevent these conditions. Everglades Sugar and Land Co. v. Bryan, 81 Fla. 75, 87 So. 68 (1921); State ex rel. Gardner v. Sailboat Key, Inc., 295 So.2d 658 (Fla. 3d DCA 1974); State Plant Board v. Smith, 110 So.2d 401 (Fla. 1959).
"6. Petitioner has not been denied due process or equal protection of the law and full and complete access to the Courts has been afforded to Petitioner pursuant to Article I, Section 21 of the Florida Constitution. Scholastic Systems, Inc. v. Le Loup, 307 So.2d 166 (Fla. 1975)."
DERM's cease and desist order, by its terms, was predicated specifically upon Sections 24-5(16) and 24-37(2) of the Code of Metropolitan Dade County (hereinafter referred to as Dade Code). These Sections read, in pertinent part, as follows:
"Sec. 24-5. Same  Duties and powers.
"The duties, functions, powers and responsibilities of the director, environmental resources management, shall include the following:
* * * * * *
"(16) In the event a violation of this chapter creates a health hazard or threatens serious damage to the public health, aquatic life or property, or creates a nuisance as herein defined, the director, environmental resources management, shall have the power and authority to order immediate cessation of the operations causing such conditions. Any person receiving such an emergency order for cessation of operations shall immediately comply with the requirements thereof. It shall be unlawful for any person to fail or refuse to comply with an emergency order issued and served under the provisions of this section. Any person who is convicted of wilfully failing or refusing to comply with such an emergency order shall be punished by a fine not exceeding five hundred dollars ($500.00) or by imprisonment in the county jail for not more than sixty (60) days, or both, in the discretion of the appropriate court. Each day during which the wilful failure or refusal to comply with such an emergency order continues shall constitute a separate offense.
"Sec. 24-37. Abnormal occurrences.
"(2) Power to stop operation of facility. If in the judgment of the director, environmental resources management, the abnormal operation of any facility, equipment, process, or plant is causing or will cause air pollution or water pollution to such extent as to be or become dangerous to the public health, safety or welfare, he may require such corrective measures as may be necessary for the protection of the public on an emergency basis, and he shall have the power and authority to cause all operation of the facility or plant to cease until appropriate corrective measures have been taken, by issuing an *1149 order to the owner or operator thereof directing the cessation of the operation. If the cessation of the operation of any sewage treatment plant would cause greater danger to the public than that caused by the continued operation thereof, the director, environmental resources management, shall not order such cessation, but shall order that steps be taken immediately to rectify the dangerous condition. Any person polluting waters of the county shall, within the earliest practicable time, restore said waters to the condition existing before said pollution occurred. Should such person fail to make said restoration the director, environmental resources management, may seek an injunction in a court having jurisdiction to compel said person to perform such restoration. In the alternative and at his election, if restoration is not effected, the director, environmental resources management, may make said restoration and shall be reimbursed by the persons causing the pollution for the actual costs of restoration. The director, environmental resources management, shall institute suit to enforce such reimbursement if it is not made within ten (10) days from demand therefor."
Among the several points raised by appellants is one which, in our opinion, controls the disposition of this appeal. This point, simply stated, is that DERM and its Director, under the facts of this case, lacked the legal authority to issue the original cease and desist order. In connection with this point, we note that DERM's cease and desist order did not limit itself to prohibiting any specific illegal activity proscribed by the Dade Code, but instead ordered cessation of "any further `rock ploughing' . . and/or any operation ... that could result in altering said land in any way whatsoever" until appellant submitted an environmental impact statement "... for review study and obtain[ed] approval to commence operations again from all governmental agencies concerned."
We have carefully reviewed the Dade Code Sections relied upon by the Director of DERM in issuing the cease and desist order in this case, i.e., Sections 24-5(16) and 24-37(2). In our opinion, neither these particular Sections nor Chapter 24 of the Dade Code in general gave the Director the legal authority to issue the subject order. Further, in our opinion, appellees lacked any legislative authority under Chapter 24 of the Dade Code to require any environmental impact statement from appellant. We note that this property is governed, not by any special legislation, but by Dade Code zoning ordinances which permit agricultural use, which do not require permits for such use, and which do not require any type of environmental impact statement. Further still, in our opinion, contrary to appellees' contentions, none of appellant's activities as reflected by this record show a violation of the Dade Code provisions relied upon in the cease and desist order. Appellees argue that agricultural use, in and of itself, constitutes a discharge of organic or inorganic matter as chemical compounds into the waters of Dade County within the definition of "nuisance" in the Dade Code. See § 24-3(14)(b), Dade Code. A similar problem was presented in the case of Hillsborough Cty. Envir. P. Com'n v. Frandorson Prop., 283 So.2d 65 (Fla. 2d DCA 1973). In this case, as in the Hillsborough case, the important question before us is not whether the activities complained of should or could be forbidden, but rather only whether they have been.
As Associate Judge Alan R. Schwartz (now a judge on this court), writing for the majority in Hillsborough, at 68, stated: "[u]pon a straightforward reading of the unambiguous language of the controlling statutory provisions we cannot do otherwise than to hold that it has not." [i.e., the activities complained of by appellees have not been prohibited by the Dade Code].
However laudable or commendable the actions of the appellees, as stated in St. Regis Paper Company v. State, 237 So.2d 797, 799 (Fla. 1st DCA 1970), "[i]t is well settled that a statutory agency [here DERM] does not possess any inherent powers; such agency is limited to the powers *1150 granted, either expressly or by necessary implication, by the statutes [here the Dade Code] creating them." See e.g., Askew v. Cross Key Waterways, 372 So.2d 913 (Fla. 1978); Lewis v. Bank of Pasco County, 346 So.2d 53 (Fla. 1976); Sarasota County v. Barg, 302 So.2d 737 (Fla. 1974); and Sarasota County v. Beker Phosphate Corp., 322 So.2d 655 (Fla. 1st DCA 1975). In this case, the Director of the DERM acted without adequate legislative justification for imposing the requirements set forth in the cease and desist order; absent such justification the circuit court's order denying appellant's petition for writ of certiorari must be reversed and the subject order quashed.
Further, in the light of this determination, the circuit court's order dismissing with prejudice appellant's complaint for declaratory and injunctive relief should also be reversed; however, because of our determination above, it would appear that the issues raised therein are now moot. Therefore, this latter order is reversed and the cause remanded so that the circuit court may enter an order of dismissal without prejudice.
Further still, because of our determination above, it is unnecessary for us to determine the effect of the cease and desist order or to consider the other points raised by appellant on appeal.
Reversed and remanded in part.
CHARLES CARROLL, Associate Judge, dissents.