947 So.2d 1279 (2007)
IMHOTEP-NGUZO SABA CHARTER SCHOOL and Mandela-Nguzo Saba Charter School, Appellants,
v.
DEPARTMENT OF EDUCATION and Palm Beach County School Board, Appellees.
Nos. 4D05-4634, 4D05-4635.[1]
District Court of Appeal of Florida, Fourth District.
February 7, 2007.
*1280 Janice L. Jennings, Boynton Beach, for appellants.
Randall D. Burks, Ph.D., West Palm Beach, for appellee Palm Beach County School Board.
PER CURIAM.
Imhotep-Nguzo Saba Charter School and Mandela-Nguzo Saba Charter School appeal decisions of the State Board of Education which affirmed the Palm Beach County School Board's decisions to deny charters to the two proposed schools. The schools primarily challenge the application and constitutionality of a School Board policy which looked to the academic and financial success of the new schools' predecessor, the Joseph Littles Nguzo Saba Charter School, Inc. (Joseph Littles). We conclude that the challenged policy was valid and affirm.
As of early 2005, the Palm Beach County School Board had approximately 8,000 students in 46 charter schools, including approximately 150 students at Joseph Littles. Joseph Littles has been in existence since 1999. On June 23, 2003, the School *1281 Board extended Joseph Littles' charter for ten years. Joseph Littles has concentrated on serving poor children, many of whom had failed at other schools. It has a unique curriculum of African-American studies.
Joseph Littles has now applied to the School Board to create two new charter schools, Imhotep-Nguzo Saba Charter School and Mandela-Nguzo Saba Charter School. In April 2005, the School Board denied the creation of the two new schools based on Palm Beach County School Board Policy 2.56, entitled "Number of Charter Schools." The policy implements a State Board of Education waiver, exempting Palm Beach County from the statutory cap on the number of charter schools permissible in a particular county. The policy states certain criteria to be used in approving charter schools, which generally track the statutory declaration of the purposes of the charter school concept. However, subsection 3(d) of the policy states in part that:

[A]n applicant person/organization which already has a charter from the Board would need to demonstrate that such person/organization has a track record of success in operating an exemplary charter school for the past two (2) fiscal years. An exemplary charter school would be characterized by:
i. remaining in full compliance with its charter;
ii. demonstrating fulfillment of the statutory purposes of charter schools . . .; and
iii. for schools subject to state performance grades, maintaining a performance grade of at least B or demonstrating significant annual learning gains. (emphasis added).
The School Board deemed Joseph Littles to be non-exemplary based on both financial and academic non-compliance. The school's financial non-compliance had to do with its untimely submission of required reports for fiscal year 2004-05, an improper check authorization policy allowing a single signatory, declining enrollment, accounting problems regarding grant monies, and a significant negative fund balance. The academic problems consisted of a D grade for 2003-04 and a projected grade (based on the 2004 Diagnostics) of either a D or an F for 2004-05. In addition, only half the school's teachers were certified. Thus, the School Board denied the applications for the new schools based on Policy 2.56 and the non-exemplary nature of Joseph Littles.
Joseph Littles appealed the School Board's decisions to the State Board of Education, which submitted the matter to the Florida Charter School Appeal Commission for review and a non-binding recommendation. See § 1002.33(6)(c), (f), Fla. Stat. (2005). By a final vote of 4 to 3, the appeal commission found that the School Board did not have statutory good cause to deny the charter school applications. The State Board of Education met on October 18, 2005, to consider Joseph Littles' appeal and the appeal commission's recommendation. At that hearing, Joseph Littles' attorney argued that the School Board's adoption of the subject policy was ultra vires based on the statute that exempts charter schools from School Board policies. The State Board of Education voted unanimously to reject the appeal commission's recommendation as to both of the proposed schools and upheld the School Board's denial of those applications.
The Palm Beach County School Board is the sponsor of Joseph Littles and would be the sponsor of the two new schools had they been approved. See § 1002.33(5), Fla. Stat. (2005). The *1282 schools place primary reliance on Florida Statutes section 1002.33(5)(b)4., which states that the "sponsor's policies shall not apply to a charter school." This reliance is misplaced. While the subject provision was clearly aimed at giving charter schools some measure of academic and administrative freedom, we do not read this provision to prohibit the School Board from adopting and enforcing policies related to the creation, renewal or termination of the charter schools they sponsor. This is true because the legislature has delegated primary decision-making authority to the school boards over these basic decisions. While such policies may well have influences on academic and administrative freedoms at the charter schools, the adoption of a policy that only schools with a C average on the FCAT will be renewed, for example, seems fundamentally different than a school board sick leave policy for teachers, which would most likely not apply to charter schools under the statute. We leave to future case law the development of this distinction, but the charter school creation policy at issue here does not appear to be a prohibited attempt to apply School Board policies to either Joseph Littles or the new schools.
An application for a charter school can be denied for "good cause." § 1002.33(6)(b)3., Fla. Stat. (2005).[2] The statute does not define good cause. The critical issue posed by this appeal is whether the legislature, in enacting the charter school approval process, provided sufficient minimum guidelines to the local school boards as to which applications should be granted and which should be denied. Even more particularly, we must address whether the School Board could constitutionally adopt its policy which makes "good cause" for the denial of a new school charter depend on the academic and financial success of another school operated by the applicant. This is a serious question since, as a general matter, it is the legislature's job to say what the law is, not that of a local school board. See Art. II, § 3, Fla. Const. ("The powers of the state government shall be divided into legislative, executive and judicial branches. No person belonging to one branch shall exercise any powers appertaining to either of the other branches unless expressly provided herein."); Dep't of Ins. v. Se. Volusia Hosp. Dist., 438 So.2d 815, 820 (Fla. 1983) ("It is the power to say what the law is that is prohibited from being delegated."). The Florida Supreme Court has stated "`repeatedly and without exception that Florida's Constitution absolutely requires a `strict' separation of powers.'" State v. Avatar Dev. Corp., 697 So.2d 561, 564 (Fla. 4th DCA 1997) (quoting B.H. v. State, 645 So.2d 987, 991 (Fla.1994)), approved, 723 So.2d 199 (Fla.1998).
Under separation of powers principles and the "nondelegation of duties doctrine," statutes granting enforcement powers to executive agencies "must clearly set out adequate standards to guide the agency in the execution of the powers delegated and must define those powers with sufficient clarity to preclude the agency from acting through whim, favoritism, or unbridled discretion." In re Advisory Opinion to the Governor, 509 So.2d 292, 311 (Fla.1987). The "crucial test" is whether the statute "contains sufficient standards or guidelines to enable the agency and the courts to determine whether the agency is carrying out the legislature's *1283 intent." Dep't of Ins., 438 So.2d at 819. If a statute is so vague and uncertain in its terms that no one can say with certainty, from the terms of the law itself, what the law is, "`it must be held unconstitutional as attempting to grant to the administrative body the power to say what the law shall be.'" Sarasota County v. Barg, 302 So.2d 737, 742 (Fla.1974) (quoting Conner v. Joe Hatton, Inc., 216 So.2d 209, 211 (Fla.1968)):
The Legislature cannot delegate to an administrative agency, even one clothed with certain quasi-judicial powers, the unbridled discretion to adjudicate private rights. It is essential that the act which delegates the power likewise defines with reasonable certainty the standards which shall guide the agency in the exercise of the power.
Delta Truck Brokers, Inc. v. King, 142 So.2d 273, 275 (Fla.1962).
The nature of the subject matter may be important in determining whether there has been an improper delegation of authority. The Florida Supreme Court has stated:
The specificity with which the legislature must set out statutory standards and guidelines may depend upon the subject matter dealt with and the degree of difficulty involved in articulating finite standards. The same conditions that may operate to make direct legislative control impractical or ineffective may also, for the same reasons, make the drafting of detailed or specific legislation for the guidance of administrative agencies impractical or undesirable.
In re Advisory Opinion, 509 So.2d at 311. "`Flexibility by an administrative agency to administer a legislatively articulated policy is essential to meet the complexities of our modern society.'" Avatar Dev., Corp., 697 So.2d at 565 (quoting Askew v. Cross Key Waterways, 372 So.2d 913, 924 (Fla.1978)).
Here, the schools have argued that the only legislative guidance as to what "good cause" means is found in section 1002.33(6). That section states, in pertinent part:
(a) A person or entity wishing to open a charter school shall prepare an application that:
1. Demonstrates how the school will use the guiding principles and meet the statutorily defined purpose of a charter school.
2. Provides a detailed curriculum plan that illustrates how students will be provided services to attain the Sunshine State Standards.
3. Contains goals and objectives for improving student learning and measuring that improvement. These goals and objectives must indicate how much academic improvement students are expected to show each year, how success will be evaluated, and the specific results to be attained through instruction.
4. Describes the reading curriculum and differentiated strategies that will be used for students reading at grade level or higher and a separate curriculum and strategies for students who are reading below grade level. A sponsor shall deny a charter if the school does not propose a reading curriculum that is consistent with effective teaching strategies that are grounded in scientifically based reading research.
5. Contains an annual financial plan for each year requested by the charter for operation of the school for up to 5 years. This plan must contain anticipated fund balances based on revenue projections, a spending plan based on projected revenues and expenses, and a description of controls that will safeguard finances and projected enrollment trends.
*1284 The schools contend that because their applications were facially complete, according to the statutory criteria, there was no "good cause" for the School Board to deny them. We disagree. We find that the "Guiding Principles; Purpose" section of the charter school statute provides sufficient legislative guidance to support the School Board's Policy 2.56. That portion of the statute states:
(a) Charter schools in Florida shall be guided by the following principles:
1. Meet high standards of student achievement while providing parents flexibility to choose among diverse educational opportunities within the state's public school system.
2. Promote enhanced academic success and financial efficiency by aligning responsibility with accountability.
3. Provide parents with sufficient information on whether their child is reading at grade level and whether the child gains at least a year's worth of learning for every year spent in the charter school.
(b) Charter schools shall fulfill the following purposes:
1. Improve student learning and academic achievement.
2. Increase learning opportunities for all students, with special emphasis on low-performing students and reading.
3. Create new professional opportunities for teachers, including ownership of the learning program at the school site.
4. Encourage the use of innovative learning methods.
5. Require the measurement of learning outcomes.
(c) Charter schools may fulfill the following purposes:
1. Create innovative measurement tools.
2. Provide rigorous competition within the public school district to stimulate continual improvement in all public schools.
3. Expand the capacity of the public school system.
4. Mitigate the educational impact created by the development of new residential dwelling units.
§ 1002.33(2), Fla. Stat. (2005).
In our opinion, the "Guiding Principles; Purpose" section of the statute, when coupled with the mandatory application requirements, save the legislative delegation from separation of powers problems. Where reasonably possible a statute will be interpreted in a manner that resolves all doubt in favor of its constitutionality. State v. Fuchs, 769 So.2d 1006, 1008 (Fla. 2000); Dep't of Ins., 438 So.2d at 820; Barg, 302 So.2d at 741. Clearly, the first part of Policy 2.56 tracks the guiding principles/purpose language quite closely. The important question is whether these statements of legislative purpose provide sufficient ground to allow the School Board to adopt the final section of the rule, requiring an applicant who already owns a school to show that it is an "exemplary" school before another charter will be granted to the same entity. We believe that they do. The entire statutory scheme shows legislative concern with the quality of the academic and financial performance of charter schools and the ability of the applicant to meet the high standards set by the statute. The School Board's policy of requiring exemplary performance is a practical and reasonable approach to testing the academic and financial abilities of an applicant in furtherance of the statute's purposes.
The charter schools have also attempted on appeal to argue that the reason for the academic and financial deficiencies at Joseph Littles was due to inequitable funding by the School Board. There is no evidence in the record to support this claim. The schools suggest *1285 that the absence of evidence on this issue is through no fault of their own and argue that the charter school appeal process is flawed because there was no apparent place for the formal presentation of evidence. The charter schools did not make this argument in the hearing before the State Board of Education and, in fact, point to no instance where they actually sought to present evidence but were denied the opportunity to do so. Therefore, we cannot consider this issue for the first time on appeal.
The State Board of Education concluded that there was competent, substantial evidence to support the School Board's finding that the existing charter school of the applicant was fiscally and academically non-compliant, and that this finding was statutory good cause for denial of the applications for the new charter schools. An agency's interpretation of a statute that it is charged with enforcing is entitled to great deference and will be approved on appeal unless it is clearly erroneous. BellSouth Telecomms., Inc. v. Johnson, 708 So.2d 594, 596-97 (Fla.1998); Dep't of Ins., 438 So.2d at 820. Where the State Board of Education's determination of an appeal of the approval or denial of a charter school application is supported by competent, substantial evidence in the record, the final order should be affirmed. See Sch. Bd. of Osceola County v. UCP of Cent. Fla., 905 So.2d 909 (Fla. 5th DCA), review denied, 914 So.2d 954 (Fla.2005). In the instant case, the record supports the State Board of Education's conclusion. Accordingly, we affirm the final order.
Affirmed.
STEVENSON, C.J., WARNER and TAYLOR, JJ., concur.
NOTES
[1] We have consolidated these related cases for opinion purposes only.
[2] Effective July 1, 2006, the Legislature eliminated the "good cause" requirement from the statute, seemingly vesting even greater discretion in local school boards. Ch. 06-190, § 1, at 1928, Laws of Fla. We express no opinion as to the meaning or validity of this amendment.